# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KUHN CAPITAL, INC.,<br>an Illinois Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | **FILED: APRIL 16, 2008** |
| | ) | Case No.:    08CV2170      TC |
| v. | ) | Judge:    JUDGE ST. EVE |
| | ) |       MAGISTRATE JUDGE DENLOW |
| GIBSON GUITAR CORP.,<br>a Delaware Corporation, | ) | Magistrate Judge: |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S JOINT NOTICE OF REMOVAL

Defendant Gibson Guitar Corp. ("Gibson" or "Defendant"), by its attorneys, submits this

Notice of Removal pursuant to 28 U.S.C. § 1446.  In support thereof, Defendant states as

follows:

      1.      Defendant has been sued in an action filed in the Circuit Court of Lake County,

Illinois (the "Complaint").  The Complaint was filed on February 22, 2008 and a copy of the

Complaint with exhibits is attached hereto as Exhibit A.

      2.      This Notice of Removal is timely.  Under 28 U.S.C. § 1446(b), this Notice of

Removal must be filed within 30 days of the service upon Gibson of the Complaint and

Summons.  *See also Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999)

(30-day clock for removal begins only with formal service).  Defendant received an informal

copy of the Complaint on February 22, 2008.  Defendant was not served at that time, however,

and only agreed to waive service and accept process on March 17, 2008, less than 30 days ago.

      3.      Other than the Complaint, no other filings have been served on Defendant.

4.     The time for Defendant to answer, move, or otherwise plead with respect to the Complaint has not yet expired.

5.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 84(d) and 1441(a), because the United States District Court for the Northern District of Illinois is the federal judicial district and division embracing the Circuit Court of Lake County, Illinois, where this action was originally filed.

6.     By filing a Notice of Removal in this matter, Defendant does not waive its right to object to service of process, the sufficiency of process, jurisdiction over the person, or venue, and Gibson specifically reserves the right to assert any defenses and/or objections to which it may be entitled.

### Diversity of Citizenship

7.     This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. § 1332 because Plaintiffs are citizens of Illinois  and Defendant is not and the amount in controversy exceeds $75,000.

8.     Complete diversity exists between the parties to this action.  Defendant is a Delaware corporation.  Complaint ¶ 4.  Defendant's principal place of business is Nashville, Tennessee.  *Id.*

9.     Upon information and belief, Kuhn Capital is an Illinois Corporation with its principal place of business in Lake Forest, Illinois.  *Id.* at ¶ 2.  Upon information and belief, Ryan Kuhn is a resident of Illinois.  *Id.* at ¶ 3.

10.     Complete diversity exists because Kuhn Capital and Ryan Kuhn (collectively "Plaintiffs") are citizens of Illinois and Defendant is a citizen of Delaware and Tennessee.

9164748                                                    2

**Amount in Controversy**

11.     The amount in controversy requirement of 28 U.S.C. § 1332 is also satisfied.

Under 28 U.S.C. § 1332(a), the amount in controversy in a case where federal jurisdiction is

based on diversity of citizenship must exceed $75,000.

12.     In their Complaint, Plaintiffs allege that Kuhn Capital entered into an agreement

with Defendant to provide certain services for a fee of $250,000.  Complaint ¶ 12.  Plaintiffs

request "this Court enter judgment in Kuhn Capital's favor and against Defendant Gibson Guitar

Corporation in the sum of $250,000."  Counts I & II Prayer for Relief.

13.     By virtue of complete diversity of citizenship between the parties and an amount

in controversy well in excess of $75,000, this action may be removed pursuant to 28 U.S.C.

§§ 1441 and 1446.

14.     Defendant has served Plaintiffs with a copy of this Notice of Removal and has

filed the same with the Clerk of the Circuit Court of Lake County.

WHEREFORE, Defendant requests that the above-captioned lawsuit, pending in the

Circuit Court of Lake County, be removed to this Court.

Dated:  April 16, 2008                    Respectfully submitted,

                                          GIBSON GUITAR CORP.


                                          By:  /s/ Ranjit J. Hakim_____
                                                    One of Its Attorneys

                                          Michael J. Gill
                                          Ranjit Hakim
                                          Mayer Brown LLP
                                          71 S. Wacker Drive
                                          Chicago, IL 60606
                                          (312) 782-0600

# EXHIBIT A

## IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

| | |
|---|---|
| KUHN CAPITAL, INC.,<br>    an Illinois Corporation,<br><br>                    Plaintiff,<br><br>     v.<br><br>GIBSON GUITAR CORP.,<br>    A Delaware Corporation,<br><br>                Defendant. | )<br>)<br>)<br>)<br>)<br>)   Case No. _____<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT AT LAW

NOW COMES Kuhn Capital, Inc. ("Kuhn Capital"), by its attorneys, Ungaretti & Harris LLP, and for its complaint against Gibson Guitar Corporation ("Gibson"), states:

### NATURE OF THE CASE

1.      Kuhn Capital brings this action against Gibson to recover $250,000 in unpaid fees for services it rendered to and for the benefit of Gibson in connection with Gibson's acquisition of another business, a Danish corporation called The TC Group A/S ("TC"). TC is a developer, manufacturer and/or marketer of professional audio technology products for audio professionals and musicians, such as amplifiers, speakers, digital processors, and guitar pedals. The Kuhn Capital services to Gibson that are the subject of this suit were rendered as adjuncts and in addition to services Kuhn Capital rendered to Gibson under an express, written mergers and acquisition intermediary agreement between Kuhn Capital and Gibson which concerned, among other things, Gibson's acquisition of TC.

### THE PARTIES

2.      Kuhn Capital is an Illinois corporation with its principal place of business in Lake Forest, Lake County, Illinois, engaged in, among other things, the investment banking business.

Kuhn Capital specializes in mid-market mergers and acquisitions, advising clients on mergers and acquisitions strategies, managing acquisition or divestment campaigns, finding beneficial transaction partners, and in general maximizing returns on mergers and acquisitions investments. It has, and provided Gibson with, substantial and extremely valuable industry knowledge and expertise.

3.     Ryan Kuhn ("Mr. Kuhn") is a resident of the State of Illinois and Lake Forest, Illinois and a principal of Kuhn Capital.

4.     Gibson is a Delaware corporation with its principal place of business in Nashville, Tennessee.

## JURISDICTION & VENUE

5.     This Court has jurisdiction pursuant to 735 ILL. COMP. STAT. 5/2-209(1) and (7) because Gibson contracted with Kuhn Capital for its services in Lake Forest, Illinois and Kuhn Capital performed a substantial part of the services for Gibson that generated the fees sought in this action in Lake Forest, Lake County, Illinois.  Jurisdiction is further proper because Gibson does substantial business in Illinois on a regular, systematic basis through selling and marketing its guitars and other products to Illinois retailers and residents, including retailers and customers within Lake County, Illinois.

6.     Venue is proper in this Court pursuant to 735 ILL. COMP. STAT. 5/2-101 because Kuhn Capital performed a predominance of the services for Gibson that generated the fees sought in this action from its Lake Forest, Lake County, Illinois offices, and much of transactions and negotiations between Kuhn Capital and Gibson that are at issue as more fully pled herein occurred in Lake County, Illinois.

## FURTHER FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

7.    On December 1, 2006, Kuhn Capital and Gibson entered into a written merger and acquisition intermediary agreement in Lake County, Illinois, whereby Gibson appointed Kuhn Capital its exclusive agent for the purpose of searching for, identifying, screening, and investigating for Gibson a target company for Gibson to acquire. (the "Written Agreement"). *See* Agreement, p. 1, a true and correct copy of which is attached as Exhibit A.

8.    Under the Written Agreement, Gibson is to pay to Kuhn Capital a cash success fee (the "Success Fee") if Gibson consummates a covered transaction with a Target Company that Kuhn Capital identified and Gibson's contact with the Target Company was initiated through Kuhn Capital's efforts.    Kuhn Capital has filed an arbitration demand before the American Arbitration Association based on Gibson's breach by anticipatory repudiation of its obligation under the Written Agreement to pay Kuhn Capital a success fee relating to Gibson's imminent acquisition of TC    *See* Written Agreement ¶¶ 1-4.    Under the terms of the Written Agreement, the success fee is determined as a percentage of the overall transaction value, up to a designated cap.  Written Agreement ¶ 4.

9.    In accordance with the Written Agreement's terms, Kuhn Capital identified The TC Group A/S ("TC"), a Denmark corporation, as a Target Company.  Kuhn Capital introduced Gibson to TC, and Gibson initiated contact with TC Group through Kuhn Capital.

10.    On July 30, 2007, TC and Gibson entered into a Letter of Intent and Agreement ("LOI") whereby Gibson offered to acquire TC.  A true and correct copy of the LOI is attached as Exhibit B. The LOI states the material terms and conditions of the transaction.  According to the LOI, the total transaction value of the acquisition of TC would be in excess of $68,000,000.00 (sixty-eight-million dollars).

11.    In or about August 2007, Gibson also requested that Kuhn Capital provide it with certain additional services that were outside the scope of the Written Agreement, and for which Gibson agreed to pay additional compensation to Kuhn Capital.   These additional services requested of Kuhn Capital by Gibson included conducting a due diligence investigation, participating in negotiations on Gibson's behalf, and performing all other tasks incident to and supporting Gibson's acquisition of TC.  (the "Additional Services").

12.    On or about August 15, 2008, Gibson, through its chief financial officer Henry Juszkiewicz ("Juszkiewicz") and chief legal counsel Roxanne Khazarian ("Khazarian"), agreed to pay Kuhn Capital $250,000 in exchange for these Additional Services. A true and correct copy of an e-mail evidencing this agreement is attached as Exhibit C.

13.    The Additional Services agreement was not wholly reduced to an integrated writing.

14.    Kuhn Capital and Gibson agreed to the additional $250,000 fee because the Additional Services Kuhn Capital was to provide for that consideration were outside the scope of, and in addition to, those services Kuhn Capital was to provide Gibson, and Gibson was to pay for, under their Written Agreement.

15.    Pursuant to, and in reliance on, the subsequent agreement for Additional Services between Gibson and Kuhn Capital, between August 2007 and December 2007 Kuhn Capital performed valuable services for Gibson in preparation for closing the transaction, including reviewing hundreds of documents in a due diligence investigation of TC on Gibson's behalf, working with TC and with Gibson executive management, counsel and staff, analyzing, reporting to and advising Gibson on all key financial aspects of the transaction and otherwise coordinating and directing all actions necessary to consummate the Gibson-TC transaction.

16.    On November 29, 2007, Mr. Kuhn, as principal of Kuhn Capital, sent an e-mail message to Mr. Juszkiewicz regarding the Gibson-TC transaction, requesting payment for the unpaid fees under the Written Agreement and Additional Services agreement.  Claiming surprise and apparent ignorance that the Gibson-TC transaction included Gibson's acquisition of TC's current liabilities, Mr. Juszkiewicz responded, "Kiss your fee fee good bye," thus anticipatorily breaching the Written Agreement and further breaching Gibson's contract with Kuhn Capital with respect to its compensation for the Additional Services.  True and correct copies of these e-mails are attached as Exhibit D.

17.    On December 12, 2007, Mr. Kuhn again sent another e-mail message to Mr. Juszkiewicz requesting that Gibson pay Kuhn Capital the $250,000 fee for the Additional Services.  A true and correct copy of the December 12, 2007 e-mail is attached as Exhibit E.

18.    To date, Mr. Juszkiewicz and Gibson have failed and refused to respond to Mr. Kuhn's e-mail communications and failed and refused to pay Kuhn Capital for the Additional Services.

## COUNT I
### (Quantum Meruit)

19.    Kuhn Capital incorporates and realleges all of the foregoing the allegations of paragraphs 1 through 18 inclusive hereof as thought set forth herein.

20.    After Kuhn Capital performed all of its material obligations under the Written Agreement, Gibson requested that Kuhn Capital provide Additional Services such as conducting a due diligence investigation, participating in negotiations on Gibson's behalf, and performing all other tasks incident to and supporting Gibson's acquisition of TC.

21.    The Additional Services provided by Kuhn Capital were outside the scope of the Written Agreement between Kuhn Capital and Gibson, therefore, were not covered by that

Written Agreement nor was Kuhn Capital compensated for those Additional Services under the Written Agreement.

22.    In consideration for the Additional Services to be provided by Kuhn Capital to Gibson, Gibson agreed to pay Kuhn Capital $250,000 (two-hundred-fifty-thousand dollars).

23.    Kuhn Capital fully provided the Additional Services to Gibson with the reasonable expectation of being paid, which reasonable expectation was fostered by Gibson's express agreement.

24.    Gibson knew or reasonably should have known that Kuhn Capital was expecting to be paid for the Additional Services it rendered to Gibson at Gibson's request and with Gibson's express authority, particularly because Gibson expressly agreed to pay Kuhn Capital for the Additional Services and ratified that express agreement by knowingly accepting the benefits of Kuhn Capital's performance of the Additional Services.

25.    Gibson accepted and directed Kuhn Capital to provide the Additional Services without complaint or objection.

26.    Kuhn Capital fully performed all of its obligations under the Additional Services agreement with Gibson.

27.    Gibson has refused to pay Kuhn Capital $250,000 for the Additional Services it provided.

28.    Kuhn Capital is entitled to payment from Gibson for the value of its services in the amount of $250,000, which sum equitably and justifiably compensates Kuhn Capital for the value of the additional services received, accepted and enjoyed by Gibson.

**WHEREFORE**, Plaintiffs Kuhn Capital, Inc. prays that this Court enter judgment in Kuhn Capital's favor and against Defendant Gibson Guitar Corporation in the sum of $250,000, for the full value of services it provided to Defendant together with interest at the highest rate

applicable by law.   Plaintiff Kuhn Capital, Inc. further respectfully requests such other or additional relief in its favor and against the Defendant Gibson Guitar Corporation as this Court deems fair, just and equitable in the premises.

**COUNT II**
***(Breach of Contract)***

29.    Kuhn Capital incorporates and realleges all of the foregoing the allegations of paragraphs 1 through 28 inclusive hereof as thought set forth herein.

30.    After Kuhn Capital performed its obligations under the Written Agreement, Gibson requested that Kuhn Capital provide Additional Services as previously alleged.

31.    The Additional Services provided by Kuhn Capital were outside the scope of the written Agreement between Kuhn Capital and Gibson, and therefore were not covered by the Written Agreement nor was Kuhn Capital compensated for these services under the Written Agreement.

32.    On or about August 15, 2008, Gibson, through its chief financial officer Henry Juszkiewicz and its Senior Vice President, General Counsel & Secretary Roxanne Khazarian, agreed to pay Kuhn Capital $250,000 in consideration for the Additional Services. *See* Exhibit C.

33.    A separate agreement for the Additional Services was made because the Additional Services Gibson requested Kuhn Capital to provide were outside the scope of those for which Kuhn Capital was to be compensated by Gibson under the Written Agreement between them.

34.    Pursuant to, and in reliance on, the subsequent agreement for Additional Services between Gibson and Kuhn Capital, between August 2007 and December 2007 Kuhn Capital performed valuable services for Gibson in preparation for closing the transaction, as previously alleged herein.

35.    Gibson accepted and directed Kuhn Capital to provide the Additional Services without complaint, thus ratifying its agreement to pay for the Additional Services.

36.    Kuhn Capital fully performed all its obligations under the Additional Services agreement.

37.    To date, Gibson has neglected, failed and refused to pay Kuhn Capital the $250,000 due it for the Additional Services it provided, and has thus breached the Additional Services agreement.

38.    Kuhn Capital was damaged by Gibson's breach as aforesaid and is entitled to payment from Gibson for the value of the Additional Services in the amount of the $250,000 contract price.

**WHEREFORE**, Plaintiffs Kuhn Capital, Inc. prays that this Court enter judgment in Kuhn Capital's favor and against Defendant Gibson Guitar Corporation in the sum of $250,000, for the full value of services it provided to Defendant together with interest at the highest rate applicable by law.   Plaintiff Kuhn Capital, Inc. further respectfully requests such other or additional relief in its favor and against the Defendant Gibson Guitar Corporation as this Court deems fair, just and equitable in the premises.

February 22, 2008                    Respectfully submitted,

                                     KUHN CAPITAL, INC.

                                     By _____
                                         One of its attorneys

David Bronner
Nicholas Anaclerio
Antonio Caldarone
UNGARETTI & HARRIS LLP
3500 Three First National Plaza
Chicago, Illinois 60602
(312) 977-4400
(312) 977-4405 (facsimile)

1106066-2                              8

## IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

| | | |
|---|---|---|
| KUHN CAPITAL, INC.,<br>    an Illinois Corporation, | )<br>)<br>) | |
|         Plaintiff, | )<br>) | |
|    v. | )<br>) | Case No. _____ |
| GIBSON GUITAR CORP.,<br>    A Delaware Corporation, | )<br>)<br>) | |
|         Defendant. | )<br>) | |

### AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222(B)

Pursuant to Supreme Court Rule 222 (B), counsel for the above-named Plaintiff certifies that Plaintiff seeks money damages in excess of Fifty Thousand and 00/100ths Dollars ($50,000).

February 22, 2008

Respectfully submitted,

KUHN CAPITAL, INC.

By _____
    One of its attorneys

David Bronner
Nicholas Anaclerio
Antonio Caldarone
UNGARETTI & HARRIS LLP
3500 Three First National Plaza
Chicago, Illinois 60602
(312) 977-4400
(312) 977-4405 (facsimile)

1109311-1

EXECUTIVE OFFICE                    PAGE  01

309 Plus Park Blvd
Nashville, TN 37217
615-871-4500 ext. 3455
Fax: 615-884-9527
www.Gibson.com
sarah.ritter@gibson.com



# Fax

| To: | Kuhn Capital | From: | Henry Juszkiewicz |
|---|---|---|---|
| Fax: | 847-457-2401 | Pages: | 9 |
| Phone: | | Date: | 11/29/06 |
| Re: | Executed document | cc: | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

EXHIBIT

tabbies

*A*

## KUHN CAPITAL
### m&a for the information age

Henry Juszkiewicz
Chairman and Chief Executive Officer
Gibson Guitar Corporation
309 Plus Park Blvd.
Nashville, TN 37217

December 1, 2006

Letter Agreement
Confidential

Dear Henry,

This exclusive agreement ("Agreement") between Gibson Guitar Corp. incorporated in Delaware ("Gibson"), and KC Capital, Inc., a mergers and acquisition intermediary incorporated in Illinois ("KC"), is entered into this 1st day of December, 2006, and will expire on February 28, 2007 ("Retainer Period"). The Agreement shall expire at the end of the Retainer Period unless the parties agree in writing to extend this Agreement for additional 90 day periods under the same terms defined herein.

The parties are forming this relationship to facilitate Gibson's purchase of a vendor of musical instruments, associated electronics, or accessories (a "Potential Target"). More specifically, KC must focus on Potential Targets with the characteristics as given in Exhibit A, which is incorporated herein and made an integral part of this Agreement. Notwithstanding the foregoing, Dongbei Piano Company, Kingsburg Piano Company, and Garrison Guitars shall be excluded from the definition of Potential Target. The scope of KC activities under this agreement include: (a) target identification, (b) initial target contact and preliminary screening, (c) introduction of Gibson to qualified targets, (d) ongoing support as requested by Gibson during business and financial case development, (e) advice and counsel as to general market conditions supporting target viability, and (f) advice and counsel as needed in the negotiation of purchase terms and conditions.

For purposes of this Agreement, the term "Purchase" means the consummation of a transaction by Gibson whether in one or a series of transactions, for the acquisition of KC Candidates pursuant to the terms of a definitive written agreement.

The term "KC Candidate" means any Potential Target with whom contact with Gibson was initiated by KC but excluding any Potential Target with which Gibson has independently initiated purchase discussions during the period of one hundred eighty ( 180 ) days or less prior to the date of this Agreement. A list of these excluded Potential Targets is attached as Exhibit B. Gibson may, at its discretion, subsequently remove Potential Targets from this list by written notice to KC.

The parties further agree to the following terms and conditions:

    1) During the Retainer Period, Gibson hereby appoints KC as its exclusive agent in its search for KC Candidates.

    2) KC agrees to use commercially reasonable efforts to successfully identify Potential Targets for the consummation of a Purchase by Gibson including, without limitation, the following:

        A) Maintain in strict confidence and use only solely for the purposes set forth in this Agreement, all non-public Gibson information, including without limitation, the fact that

Gibson may be seeking a Purchase or has entered into Purchase discussions with any Potential Target/KC Candidate;

B) Effectively but discretely promote Gibson, its business prospects and its value to KC Candidates;

C) Seek KC Candidates with the characteristics listed in the attached Exhibit A.

D) Effectively organize, coordinate and drive the process of Potential Target/KC Candidate identification, selection, description and presentation to Gibson.

E) Communicate with Gibson regarding the search process, including continual and timely updates of Potential Target/KC Candidate status.

F) The parties understand that Gibson will assume responsibility for: (i) responding in a timely manner to KC's presentation of any KC Candidates; (ii) negotiating with KC Candidates after they are introduced to Gibson by KC; (iii) performing due diligence on KC Candidates; (iv) informing KC of any Potential Targets of which Gibson is aware; and (v) obtaining appropriate tax, legal and accounting advice regarding any potential Purchase. Gibson understands that KC is not licensed or qualified to provide expert legal and accounting advice, and Gibson agrees that KC shall have no responsibility for providing legal or accounting advice.

3)    Gibson agrees to provide KC:

A) With a Retainer Fee of $30,000, which shall be payable as follows: (i) $10,000 shall be payable by Gibson to KC upon the execution of this Agreement, and (ii) additional $10,000 payments shall be due on January 1, 2007 and February 1, 2007. KC will timely furnish Gibson with invoices for any fees and reimbursements due.

B) All Retainer Fee payments paid by Gibson and received by KC shall be deducted from any Success Fee that becomes due and payable by Gibson to KC as set forth in Section 4 below.

4)    If Gibson closes an acquisition with a KC Candidate provided by KC, Gibson agrees to compensate KC as follows:

A) With a Success Fee payable in cash but only upon the condition precedent that Gibson consummates a Purchase of a KC Candidate on the terms and conditions set forth in this Agreement. The Success fee shall be payable in pro-rata installments on a pro-rata basis at closing on a Purchase and at the time of payment of any subsequent installment as set forth in paragraph 4 (c) hereinafter. The Success Fee will be calculated in proportion to the Transaction Value (as defined below) according to the following schedule:

| Transaction Value | Success Fee |
|---|---|
| Up to $5 million | $150,000* |
| $5 million to $10 million | $150,000 plus 2% of Value exceeding $5 million |
| $10 million - $25 million | $250,000 plus 1% of Value exceeding $10 million |
| More than $25 million | $400,000 plus 0.5% of Value exceeding $25 million Total success fee, net of retainer, not to exceed $1,000,000** |

2

NOV-29-2006 03:38  FROM:KUHN CAPITAL          18474572401          TO:16158845499    P.4

\*[In no event shall KC's Success Fee total less than $150,000 per Purchase net of any Retainer Fees.]

\*\* [In no event shall KC's Success Fee total more than $1,000,000 per Purchase net of any Retainer Fees.]

B) For the purposes of this Agreement, "Transaction Value" shall mean, with respect to any Purchase, (i) the total amount (whether paid in cash and/or other property, and valued at fair market value if not paid in cash), without duplication, paid or payable, directly or indirectly, to, or for the benefit of, the KC Candidate (including any subsidiary thereof) and/or its security holders, including amounts paid or payable to holders of options, warrants or convertible securities, in respect of the capital stock (or other ownership interests) or assets of the KC Candidate, and also including amounts loaned to the KC Candidate, plus (ii) the face amount of any indebtedness of the KC Candidate that (A) in a sale of assets, is actually repaid by Gibson in connection with the Purchase, or (B) in any other Purchase, is assumed or repaid by Gibson in connection with the Purchase or remains outstanding after consummation of the Purchase; minus (iii) any cash on the balance sheet of the KC Candidate at the time the Purchase is consummated that is acquired by Gibson in the Purchase. "Transaction Value" shall include any consideration held in escrow and future payments which are contingent upon the performance of the KC Candidate or any successor to the KC Candidate, and shall also include any payments to the KC Candidate or to management of the KC Candidate on account of an agreement not to compete or similar restriction; provided any sales or change of control bonuses paid to management or in exchange for agreements not to compete shall not be included in "Transaction Value". In the event a Purchase is accomplished through a recapitalization, reorganization, restructuring or other similar transaction (including, without limitation, through negotiated repurchases of the KC Candidate's securities, an issuer tender offer, an extraordinary dividend or distribution, a spin-off, split-off or other similar transaction), the Transaction Value shall also include the value of the KC Candidate's equity securities or other equity interests retained by its security holders.

C) KC's Success Fee is due and payable upon the consummation of a Purchase of a KC Candidate in accordance with the terms and conditions of this Agreement.

D) If any portion of the Transaction Value is deferred, or contingent upon future performance by the KC Candidate or Gibson, such portion will be treated as part of the Transaction Value, and Gibson will make incremental payment of any deferred amount due on the Success Fee to KC when Gibson pays to, or accepts from the KC Candidate, the deferred or contingent portions. Any amounts held in escrow post-closing will not be treated as deferred or contingent payments.

E) Notwithstanding the above, Gibson and KC may mutually agree at any time after the consummation of a Purchase upon the present value of any deferred or contingent payments related to a Purchase, and therefore the present value of KC's Success Fee related to such payments. In such case, Gibson may discharge all liability for deferred or contingent payments of the Success Fee by paying KC the agreed-upon present value.

F) With reimbursement of documented travel expenses accrued by KC in pursuit of KC Candidates during its Retainer Period not to exceed reasonable and customary direct out of pocket costs reasonably incurred in accordance with direction from Gibson, and in any case not to exceed the aggregate amount of $3,000 throughout the Retainer Period without prior written Gibson authorization.

3

NOV-09-2006 03:39 FROM:KUHN CAPITAL    EXECUTIVE OFFICE    PAGE 05
18474572401    TO:16158049499    P.5

5) Gibson will have full access to KC Candidates during the KC's Retainer Period and thereafter for the purpose of doing all things necessary to successfully evaluate, negotiate, and close a Purchase transaction provided that Gibson timely notifies KC in advance of such contact. Notwithstanding the above, Gibson will have full access to all KC candidates to further the pursuit of normal Gibson trade activities without this notification requirement.

6) KC hereby indemnifies and shall defend and hold harmless Gibson, its affiliates and all of their respective employees, directors, officers, agents, representatives and successor entities for the acts or omissions of KC or its breach of this Agreement. Gibson will indemnify KC and all of its respective employees, directors, officers, agents, representatives and successor entities for any third-party claims against KC based on Gibson's willful, fraudulent, or grossly negligent actions.

7) The parties agree that an executed facsimile of this Agreement carries the same legal obligations as an original.

8) This is the entire agreement between the parties and supersedes any prior agreements. Any alterations or modifications of this Agreement must be in writing and signed by both parties.

9) The parties agree to use their good faith efforts to resolve disputes arising out of the Agreement before resorting to binding arbitration. Should the parties' good faith efforts fail to resolve the dispute, such dispute shall be resolved using binding arbitration pursuant to the rules of the American Arbitration Association. Each party will be responsible for its own costs of arbitration and related costs.

10) The parties hereby acknowledge and agree to waive any and all liabilities for consequential, incidental, and/or punitive damages which they may have against the other party, irrespective of the foreseeability or nature of such damages.

11) No failure or delay on the part of any party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of any representation, warranty or agreement herein, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right. All rights and remedies existing under this Agreement or the Schedules attached hereto are cumulative to, and not exclusive of, any rights or remedies otherwise available. In the event of any conflict between the terms of this Agreement and Exhibits attached hereto, the terms of this Agreement shall prevail. KC acknowledges and agrees that this Agreement calls for the performance of services as an independent company and that KC shall be responsible for payment of all subject taxes or fees as required. Nothing herein contained shall create or be deemed to create any relationship of agency, partnership or joint venture between Gibson and KC. This Agreement shall be construed, and the obligations of the parties hereto shall be determined, in accordance with the laws of the State of Tennessee, as if made between residents of the state and to be performed fully therein.

4

NOV-29-2006 03:39  FROM:KUHN CAPITAL    18474572401    TO:16158849490    P.6

AGREED TO AND EXECUTED THIS 1ST DAY OF DECEMBER, 2006.

GIBSON GUITAR CORP.

By: _____
Henry Juszkiewicz
Chairman and Chief Executive Officer
Gibson Guitar Corp.
309 Plus Park Blvd.
Nashville, TN 37217

KUHN CAPITAL, INC.

By: _____
Ryan Kuhn
President
Kuhn Capital, Inc.
500 Western Ave., Suite 200
Lake Forest, Illinois 60045

5

NOV-29-2006 03:39   FROM:KUHN CAPITAL        18474572401        TO:16153849499        P.7

Exhibit A

## Gibson M&A Rationale & Target Criteria

Gibson M&A Rationale
- To more rapidly and cheaply increase market share than is possible through organic growth. We define the market as the activities of making and listening to music. "Making" consists of:
  - Composing
  - Playing
  - Integrating/collaborating.
  - Learning
  - Producing (transmitting, promoting, publishing, packaging, distributing, etc.)
- To exploit new technologies and other capabilities now controlled by M&A targets.
- To enter new market segments, or to eliminate real or potential competitors.

Gibson Benefits Sought
Margin enhancement through economies in:
1) Marketing (brand leverage)
2) Manufacturing (gains in either efficiency or effectiveness)
3) Distribution (increased channel volume, new channels)
4) Accelerated technology development (buy vs. make)

Gibson Sectors Searched (in rough declining priority)
1) Electronic Technologies
   a. Amps, signal processors
   b. Speakers (e.g., Klipsch)
   c. Synths, workstations
   d. Mikes
   e. Mixers
   f. Recorders
   g. Accessories (cables, etc.)
2) Instruments
   a. Guitars (e.g., Fender)
   b. Basses
   c. Drums
   d. Pianos
3) Instrument Accessories (strings, cases, etc.)

NOV-29-2006 03:40 FROM:KUHN CAPITAL    18474572401    TO:16150049499    P.8

<u>Gibson Target Criteria</u>

Companies capable of satisfying the above characteristics in addition to:

1) Value
   a. In cash, less than $20M
   b. In equity, less than Gibson's value (maintain control)
2) Location (in declining priority)
   a. US
   b. China
   c. Europe
3) Availability: within six months
4) Financial performance
   a. For a Going Business
      i. Profitable
      ii. If not profitable, clear path to profitability and positive short-term cash flow
   b. For an Asset
      i. Immediate or rapid application to current operations

5) Senior Management Retention
   a. Willing to stay on up to two years when possessing valuable proprietary knowledge or skill
   b. Needn't stay on more than six months (through integration) when such knowledge or skill not particularly valuable

## Exhibit B

### Excluded Potential Targets

**Ableton AG**
Schönhauser Allee 6-7
D-10119 Berlin
Germany

**Cakewalk**
268 Summer St, 8th Floor
Boston, MA 02210
United States

**Drum Workshop**
1450 Lunt Ct
Oxnard, CA 93030
United States

**Hoshino Gakki Co. Ltd**
3-22 Shumoku-cho, Higashi-ku
Nagoya, 461-8717
Japan

**J. D'Addario & Company, Inc.**
595 Smith St
Farmingdale, NY 11735
United States

**Latin Percussion, Inc.**
160 Belmont Ave.
Garfield, NJ 07026
United States

**Line 6, Inc.**
26901 Agoura Road
Agoura Hills, CA
91301-2513
United States

**LOUD Technologies Inc.**
16220 Wood Red Rd. NE
Woodinville, WA 98072
United States

**Marshall Amplification plc**
Denbigh Road, Bletchley,
Milton Keynes, MK1 1DQ
England

**Native Instruments Software**
**Synthesis GmbH**
Software Synthesis GmbH,
Schlesische Straße 28
D-10997 Berlin
Germany

**Roland Corporation**
20 Sanczaishinoh 1-chome, Kita-
ku
Osaka, 330-0002
Japan



GIBSON GUITAR CORP.
309 PLUS PARK BLVD.
NASHVILLE, TN 37217


Anders Fauerskov
Chief Executive Officer
The TC Group A/S
Sindalsvej 34
Risskov, Aarhus
Denmark
                                                                July 30, 2007

**Letter of Intent and "No-Shop" Agreement**

Dear Anders:

We (Gibson) are pleased to submit this Letter of Intent and Agreement (Letter and Agreement) as an expression of our interest in effectively acquiring The TC Group A/S. We are excited by the strategic and management promise of a combination and we would intend to consummate this transaction promptly, certainly before September 15, 2007.

Contemplated Transaction
In our terms below, we have assumed that all of your transaction costs and any payments due to your employees or affiliated parties as a result of our purchase are borne by TC shareholders.

This proposal is based upon, and assumes the accuracy and completeness of, the information contained in the materials you have provided us. This proposal is also contingent upon our receipt of a commitment letter from a bank with terms satisfactory to us relating to the debt financing for this transaction. We shall provide you with documentation of the feasibility of such financing as soon as is practicable, but in no event later than August 31, 2007.

Consistent with mutual discussions to date, and subject to the terms hereof, we are contemplating purchasing from your holding company TC Group all its assets such as plant, property, and equipment presently used or useable in the operation of TC Group's business or of its affiliates, accounts receivable, intellectual property and all intangible assets, real estate, (including all rights to leaseholds), all contract rights and rights to government incentives, inventory, equipment, prepaid expenses and other capital assets, all licenses, patent rights, know-how, and other commercial or proprietary information associated with TC Group or its affiliates' operations, the liability reserves, current liabilities of TC Group as well as ownership shares in all of your operating subsidiaries excluding the ownership shares in the TC Applied Technologies subsidiary (collectively the "Assets") with the assets of TC Group acquired at current book value and the balance subject to an allocation across the equity of the shares acquired.



EXHIBIT
B

warranties and indemnifications as described in a definitive purchase agreement. TC Group would execute a non-compete agreement running to the benefit of Gibson Guitar Corp. and its affiliates for a period of three (3) years. Gibson also would endeavor to secure similar non-compete agreements from the principal individual shareholders of TC Group. Notwithstanding the foregoing, the parties would work together to (i) review the structure of this proposed asset acquisition, and in particular, the tax impact on each party and, (ii) craft a final structure that is mutually beneficial with adjustments to the terms set forth herein as appropriate so long as there is no negative impact to TC Group.

We may assume some or all of TC's long-term liabilities subject to transferability, relative cost of capital and the composition of Gibson's post-close balance sheet. If we do so, such values will be deducted from the Closing Payment as defined below.

We may seek insurance from a third-party against the risk of future reserve liability exceeding your current reserve value. Such insurance cost, if any, would similarly be deducted from our purchase price in an amount not to exceed $100,000.

We consider all EBITDA, working capital and long-term liabilities referred to below to be calculated in accordance with TC Accounting Principles defined herein as generally accepted Danish accounting policies excluding amortization for development costs. We are defining the term "this year" to mean your fiscal year closing June, 2007. Payments due TC based on "earn-out" formulas are payable promptly after either Gibson's annual audit, or four months after the earn-out period terminates, whichever due date occurs first. All dollar amounts herein reflect a dollar conversion rate to the Danish Kroner of 0.179833 while the final conversion rate used shall be the rate applicable as of the date of execution of the purchase and sale agreement

1) At close we would apply a multiple of 7.5 to the EBITDA of the Assets for the fiscal year ended June 30, 2007 which you estimate at $9.1 million, generating an estimated initial value of approximately $68.25 million.
2) Gibson will assume the risk of reserve liabilities. To account for that risk, Gibson will reduce the total purchase price by $3.1 million resulting in a value of about $65.15 million.
3) From this $65.15 million value shall be deducted an amount equal to 9.4 multiplied by the difference between the interest portion on the mortgage pre-sale for, and the lease rate post-sale for, that certain real estate associated with TC Electronics to be the subject of a sale and leaseback transaction (the "Real Estate Adjustment Amount").
4) The amount resulting from the calculation above shall be the Closing Payment.
5) In addition, Gibson shall pay a contingent earn-out value of not more than $17.1 million for a total value not exceeding $82.1 million minus the Real Estate Adjustment Amount, subject to any applicable further adjustments (such total defined as the "Total Purchase Price").
   a) We would subsequently apply an "earn-out" multiple of 2.14 to the amount by which the Asset's EBITDA increases in fiscal year ending June 30, 2008 as compared to fiscal year ending June 30, 2007. You estimate this EBITDA increase at $3.9 million, generating a subsequent payment of about $ 8.5 million.
   b) We would subsequently apply an "earn-out" multiple of 1.552 to the amount by which these subsidiaries' EBITDA increases for fiscal year ending June 30, 2009 over EBITDA for the fiscal year ending June 30, 2007.

6) Regarding structure as noted above, our closing compensation will be in the form of cash, or cash and Gibson's assumption of subsidiaries' debt:

a) Gibson would receive a holdback in the amount of 7.5%. At close we would fund with cash an indemnity escrow with a term of 18 months in the amount of about 3.75% of the Total Purchase Price, (the exact proportion of escrow to total prospective purchase price is subject to due diligence), and the balance of the holdback if any would be offset against the earn-out for up to December 31, 2009. The cash portion of escrow would bear interest at market rates for the benefit of TC. Such escrow would be subject to commercially reasonable terms relating to Gibson's right to drawdown, including but not limited to minimum and maximum threshold levels for drawdowns after exhaustion of the dispute resolution procedures set forth in the final purchase and sale agreement. The minimum amount of indemnity shall be in the range of 2-5% and the maximum amount of indemnity shall be in the range of 15-20% of the Total Purchase Price.

b) The Closing Payment for the Assets is predicated upon a value for net working capital (which shall mean current assets minus current liabilities) equal to 16.7% times income statement expenses, which shall be the cost of goods sold and SG&A, for the trailing twelve months ( the "Working Capital Test "). Any amount of net working capital above or below the Working Capital Test would increase or decrease respectively dollar for dollar the Closing Payment.

c) Should we assume some or all of TC's long-term liabilities, at close we would pay TC and into escrow cash with an estimated value that reflects a dollar-for dollar-reduction from the Closing Amount equal to the amount of long-term liabilities assumed.

Before close, should a TC employee choose not to accept employment with Gibson, TC would incur the related termination costs, if any. Finally, the purchase price and related terms above are contingent upon TC Group assisting in securing the intent of key TC employees continuing with Gibson for a minimum period to be determined.

No-Shop Agreement
In consideration of the substantial expense incurred by Gibson in pursuit of its TC due diligence investigation, and subject to the execution of a final purchase and sale agreement no later than October 1, 2007, the "Termination Date"), TC agrees that until October 1, 2007 Gibson has the exclusive right to negotiate to acquire the Assets provided Gibson abides by the provisions outlined in this Letter and Agreement. TC acknowledges and agrees that it will not sell the Assets to any other purchaser other than Gibson until October 1, 2007.

Specifically, without prior written authorization from Gibson, neither TC, its officers, directors, agents, nor stockholders will, directly or indirectly, through any officer, director, stockholder, agent, or otherwise: (i) solicit or initiate, directly or indirectly, or encourage submission of inquiries, proposals, or offers from any potential acquirors (other than Gibson) relating to a merger, consolidation, reorganization, recapitalization or similar transaction of TC or any disposition of the business or the assets or securities of TC, or any part thereof; or (ii) participate in any discussions or negotiations regarding, or furnish to any person any information with respect to the merger, reorganization, recapitalization, consolidation or similar transaction of TC or the disposition of the business or the assets or any securities of TC or any part thereof.

Notwithstanding the immediately preceding sentence, if Gibson provides written notice to TC that discussions with respect to a potential acquisition are terminated, the Termination Date shall be the date of such written notice.

TC will immediately notify Gibson of any contact between TC, its officers, directors, agents or stockholders with any other person regarding any such offer or proposal or related inquiry.

TC represents and warrants (as evidenced exclusively by execution of this Letter and Agreement) that it has been authorized by its Board of Directors (acting on behalf of TC and its more than 10% stockholders) and its shareholders to enter into this Letter and Agreement. TC also represents that the execution of this agreement does not conflict with or contravene any other agreement or arrangement to which it is a party.

For the term of this Letter and Agreement, TC agrees to cooperate with Gibson and its representatives to expend commercially reasonable efforts as they pursue their due diligence investigations and to provide Gibson with reasonable access to certain key executives and other relevant parties.

The parties agree to use commercially reasonable efforts to (i) obtain all necessary approvals, consents, waivers and clearances from governmental authorities, and (ii) complete all other matters relating to the proposed acquisition and close the proposed acquisition by October 1, 2007 contingent on regulatory approval.

TC agrees to conduct its business during the period commencing as of the date of this Letter and Agreement until Termination Date in substantially the same manner as it is presently conducted and to make or commit to no material changes in the business. Specifically, TC shall not, among other things, without the consent of Gibson, do any of the following: enter into, assume or become bound or obligated by any agreement, contract or commitment or extend or modify the terms of any presently existing agreement which are not in the ordinary course of business and (a) increases the compensation of any employee of the Company, except salary increases in the ordinary course of business and consistent with past practice, (b) involves any payment or obligation to any affiliate of the Company, or (c) involves the sale of any material non-cash assets; or (iii) establishes any new, or modifies any existing, employee benefit, compensation or stock plan; or (iv) declares or pays any dividends or makes any distribution of assets to the shareholders or pays any bonuses or makes any other extraordinary payments to its officers, directors or employees, which could result in a material adverse change to the business of TC Group as compared to the status as of June 30, 2007 except as specifically contemplated by this Letter and Agreement.

TC shall promptly notify and consult with Gibson regarding any such acts or events regarding the business which could be construed as being outside the course of TC's business as normally conducted. TC understands that such acts or events, should they occur, may result in a decreased purchase price value or cause Gibson to terminate this Letter and Agreement.

Gibson and TC will each be solely responsible for and bear all their respective expenses, including, without limitation, expenses of legal counsel, accountants, and other advisors incurred at any time in connection with the Letter and Agreement, or while pursuing or consummating the definitive purchase agreement and the transactions contemplated thereby. No broker's or finder's fees have been or will be incurred by Gibson, TC or its shareholders other than those disclosed in connection with the review of

4

the transactions contemplated herein. Each party agrees to be solely responsible for any costs or liabilities incurred in connection with any such advisor which it has retained or disclosed.

The parties hereby repeat and reaffirm the obligations of confidentiality as set forth in the Mutual Non-Disclosure Agreement signed by the parties as of March 6, 2007.

<u>Other Matters</u>
This Letter and Agreement shall be governed by and construed in accordance with the domestic laws of the State of Tennessee without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Tennessee. This choice of law shall not be deemed as a precedent for the choice of law of a final purchase and sale agreement, which shall be governed by Danish law.

This Letter and Agreement may be executed in counterparts, each of which shall be deemed an original, and such counterparts together shall constitute one and the same instrument. In order to facilitate the execution of this Letter and Agreement, signatures may be exchanged via facsimile or in a Portable Document Format (pdf) attachment transmitted via e-mail.

The terms we suggest here are contingent on the satisfactory results of final due diligence to be conducted by Gibson (such results deemed to be "satisfactory" at Gibson's sole discretion), and are also subject to the ability of both parties to negotiate final terms and conditions acceptable to their Boards of Directors. Except for the terms of this Letter and Agreement relating to confidentiality, non-solicitation, operation in the ordinary course, no fees or costs and choice of law, which shall survive termination of this Letter and Agreement, the parties expressly acknowledge that (i) this Letter and Agreement is not intended to be and does not constitute a binding agreement of any kind, notwithstanding any course of conduct by the parties after the date of acceptance of this Letter and Agreement, and that (ii) in connection therewith, neither party is bound legally to the contemplated transaction until a definitive purchase agreement is executed. Both parties understand that this Letter and Agreement is not intended to, and does not, constitute an agreement by Gibson to purchase TC or an agreement by TC to sell the assets referenced above to Gibson.

The terms suggested here are further subject to the giving of any and all notices to, and the obtaining of all necessary approvals, consents, waivers and clearances from governmental authorities and from parties to material agreements, including parties to all TC leases, where the other party has a right to approve the assignment of such agreement to the Purchaser.

This Letter and Agreement shall be withdrawn and be of no further force or effect if it is not executed and delivered by you to Gibson before the close of business on July 30, 2007.

If the terms and conditions proposed herein are acceptable to you, please sign where indicated below, initial each page, and return a copy of this document to me.

Anders, we are eager to proceed and look forward to commencing the due diligence and purchase agreement discussions immediately.


Very Truly Yours,

**GIBSON GUITAR CORP.**

5

By: _____

Name: Henry Juszkiewisz
Title:   Chairman and Chief Executive Officer


**DULY EXECUTED AND AGREED:**
**THE TC GROUP A/S**

By: _____

Name: Anders Fauerskov
Title:   Chief Executive Officer

Date: _____


**DULY EXECUTED AND AGREED:**
**THE TC GROUP A/S**

By: _____

Name: Hans Houlind
Title:   Chairman

Date: _____

6

Anders, we are eager to proceed and look forward to recommencing the due diligence and purchase agreement discussions immediately.

Very Truly Yours,

GIBSON GUITAR CORP.

By:

Name: Henry Juszkiewisz
Title:  Chairman and Chief Executive Officer

DULY EXECUTED AND AGREED:
THE TC GROUP A/S

By:

Name: Anders Fauerskov
Title:  Chief Executive Officer

Date:  30. 7. 2007

DULY EXECUTED AND AGREED:
THE TC GROUP A/S

By:

Name: Hans Houlind
Title:  Chairman

Date:  30. 07. 2007

6

**From:**  Roxanne Khazarian [Roxanne.Khazarian@gibson.com]
**Sent:**  Wednesday, August 15, 2007 9:09 AM
**To:**  Ryan Kuhn
**Cc:**  Roger Mitchell; Fernando Sanchez; Jami Foster; rkhazarian4@yahoo.com
**Subject:**  RE: Incremental KC Fee Proposal

**Ryan – I received confirmation from Henry this morning that an addition to the success fee in your retainer for closing on the TC transaction, as well as an additional 3 month extension of your retainer, is acceptable. I will send you a revised amendment to close this out .**
**Thanks – Roxanne**

**Roxanne Khazarian**
**Senior Vice-President, General Counsel & Secretary**
**Gibson Guitar Corp.**
**309 Plus Park Boulevard**
**Nashville, TN 37217**

**615-871-4500, ext. 2486**

**421 West 54th Street**
**New York, NY 10019**
**212-859-0401**

**Cell - 203-339-2065**
**Alternate email - rkhazarian4@yahoo.com**

**Privileged & Confidential / Attorney-Client Work Product. The information contained within this transmission may contain privileged and confidential information. It is intended solely for the use of those persons named above. If you are not an intended recipient, you are notified that any reproduction, copying or re-transmission of this communication is strictly prohibited. If you have received this email in error, please immediately notify the sender by reply email and destroy the message and any copies in your possession**

**From:** Ryan Kuhn [mailto:rkuhn@kuhncap.com]
**Sent:** Tuesday, August 14, 2007 11:51 AM
**To:** Roxanne Khazarian
**Subject:** FW: Incremental KC Fee Proposal

Rox,

FYI below as we disussed.

Ryan

**From:** Ryan Kuhn [mailto:rkuhn@kuhncap.com]
**Sent:** Monday, August 06, 2007 2:56 PM
**To:** 'Henry Juszkiewicz'
**Subject:** Incremental KC Fee Proposal

EXHIBIT
C
tabbies

Henry,

We discussed today Kuhn Capital earning a $250K fee in addition to the currently agreed-upon fee in exchange for assuming responsibility in the TC due diligence process. Our current agreement does not call for Kuhn Capital participation in the due diligence and closing negotiations process.

For the increased fee I would "do whatever has to be done" to close the deal.

In that function, I'm willling to act as a central coordinator and clearinghouse for all relevant information. Once due diligence information is forthcoming, I would also participate -- as you see fit -- in deciding how to respond to it. Such responses include suggestions on purchase agreement language and on Gibson's negotiating positions. I would also calculate the affect of such purchase agreement changes on Gibson's return on investment.

The object is to use the results of due diligence inquiries and purchase agreement language to maximize Gibson's return on investment.

Please indicate whether you agree with this proposal.

Ryan



KUHN CAPITAL
500 Western Ave., Suite 200
Lake Forest, IL  60045
Office: 847/457-2400
Cell: 773/330-7547
www.kuhncap.com

-----Original Message-----
From: Henry Juszkiewicz [mailto:Henry.Juszkiewicz@gibson.com]
Sent: Thursday, November 29, 2007 3:08 PM
To: Ryan Kuhn
Subject: RE: TC

Do not discuss this with anyone.  You assured me it would be inappropriate
to talk to TC and yet you have done so anyway.

Get a lawyer.

Do not talk to anyone on this deal Ryan.


-----Original Message-----
From: Ryan Kuhn [mailto:rkuhn@kuhncap.com]
Sent: Thursday, November 29, 2007 9:33 AM
To: 'Henry Juszkiewicz'
Subject: RE: TC

Given this response, I presume you are unavailable to acquiring CL or
working a compromise. This despite that fact that documentation supports
your doing so.



And given your closing comment below, I feel it would be inappropriate for
me to participate in the upcoming conference call with TC until we clarify
our relationship.

Ryan

_____
Kuhn Capital
847/457-2400 (o)
773/330-7547 (c)
www.kuhncap.com

-----Original Message-----
From: Henry Juszkiewicz [mailto:Henry.Juszkiewicz@gibson.com]
Sent: Thursday, November 29, 2007 9:25 AM
To: 'Ryan Kuhn'
Subject: RE: TC

What is unbelievable is you and consequently our team did not follow my
directives. I had several heated discussions with you saying that debt is
debt and must be removed from enterprise value regardless of how it is
defined. This is standard pracrice in the industry.

Instead of a simple statement of price and multiple calculation YOU
introbuced confusing issues taking the eye off the ball.

We are not paying more than what I agreed to and told you and you will
suffer the consequences of your inability to communicate simply.

I am in an airport and unable to deal with this surprise today.

Kiss your fee fee good bye.

Henry Juszkiewicz
>From Good Link Pocket Pager

 -----Original Message-----
From:  Ryan Kuhn [mailto:rkuhn@kuhncap.com]
Sent:  Thursday, November 29, 2007 09:09 AM Central Standard Time
To:    Henry Juszkiewicz
Subject:    TC

Henry,

You have several options and I advise you to exercise one or a combination
of them immediately. Conferences between your Gibson team and TC like that
planned today won't cut it and will probably piss TC off even more.

1)    Walk and possibly get sued.

2)    Convert the current liabilities you're buying (worth about $19M)
into deeply subordinated seller's paper. SPP tells me that won't threaten
the current bank deal.

3)    Convert the CL into Gibson stock. TC's at about $9.5M EBITDA and
Gibson is - after the deal - at about $49.5M. Assume for the sake of
simplicity that the same EBITDA multiple applies to both companies. At 9.4x,
that values TC at $89M and you at $465M. So $19M equals about 4% of
post-deal Gibson stock.

4)    Push for a lower purchase price multiple. As you've heard from me many times before, you're paying a rich price. TC's worth more like 8x EBITDA. But this far into the game, TC's gonna be a lot less flexible than they could have been when I was carping about the multiple, and then about inventory, pension liabilities, etc. Nonetheless, you may be able to shave $5M off the current price by positioning the gap as a mutual problem.

Whatever works here is going to require your direct involvement. The LOI, the funds flow documents, the net NWC test, the equity structure, all those things point to Gibson buying CL. It's unbelievable that this wasn't understood. Bringing in Roxanne and Fernando to question that at this stage runs the strong risk of blowing up the deal.

Ryan

---

Kuhn Capital
847/457-2400 (o)
773/330-7547 (c)
www.kuhncap.com

-----Original Message-----
From: Ryan Kuhn [mailto:rkuhn@kuhncap.com]
Sent: Wednesday, December 12, 2007 6:20 PM
To: Henry Juszkiewicz (henry@gibson.com)
Cc: 'Roxanne.Khazarian@gibson.com'
Subject: Notice


Henry,


I hope that you are moving toward the December 17 close of your TC purchase as planned. I know the process has been challenging, but I think we both agree that a Gibson/TC combination represents a unique opportunity for Gibson to cement its leadership of the global music-making and music-enjoyment industry.


As you know, I have invested considerable effort over an extended period of time to put this deal together, and I am very proud of what has been accomplished. In addition, I have tolerated chronically late or suspended Gibson retainer payments and T&E reimbursements, and extended my services well beyond what was required in our initial agreement. For instance, while I was not contracted to participate in any due diligence investigations and negotiations leading up to, and for a month after the signing of the LOI, I did so nonetheless in order to maintain the necessary deal momentum.


Now, as this effort comes to a conclusion, I am personally and professionally very disappointed by the disparaging comments you have made about me to other participants in the process, by your cavalier attitude concerning the fees that are owed to my firm, and by your insistence in these last critical moments to exclude me from facilitating the closing of the deal. I believe you have damaged my professional reputation and unnecessarily jeopardized this transaction due to these actions.


Your communications have given me no choice but to consider my legal options in order to protect my interests in this deal as well as in the other acquisition targets that I have identified on Gibson's behalf. Accordingly, I am in the process of retaining legal counsel to take action against Gibson and to go public with my charges. I have carefully considered my position and I believe that you have given me no other alternative.


However, before I authorize legal action I am providing you notice to determine whether this controversy can be resolved. Therefore, I am giving you until Friday December 14th at 1pm to inform me whether you intend to comply with our contingency agreement and subsequent deal management agreement by timely paying my fees. If I do not hear from you by that time I will infer that you do not intend to comply and I will proceed as necessary. I look forward to hearing from you.



EXHIBIT
E

Regards,

Ryan

_____

Kuhn Capital

847/457-2400 (o)

773/330-7547 (c)

www.kuhncap.com

## CERTIFICATE OF SERVICE

Ranjit Hakim, an attorney, hereby certifies that he caused a copy of the foregoing **CIVIL COVER SHEET, DEFENDANT'S NOTICE OF REMOVAL, RULE 7.1 CORPORATE DISCLOSURE STATEMENT FOR GIBSON GUITAR CORP., AND NORTHERN DISTRICT OF ILLINOIS APPEARANCES ON BEHALF OF DEFENDANT BY MICHAEL J. GILL AND RANJIT HAKIM** to be served upon:

David Bronner
Nicholas Anaclerio
Antonio Caldarone
UNGARETTI & HARRIS LLP
3500 Three First National Plaza
Chicago, IL 60602
(312) 977-4400

by causing the same to be deposited in the United States Mail, postage prepaid, on April 16, 2008.

By: /s/ Ranjit J. Hakim_____
Ranjit Hakim