## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| KUHN CAPITAL, INC.,<br>an Illinois Corporation,<br><br>Plaintiff,<br><br>v.<br><br>GIBSON GUITAR CORP.,<br>a Delaware Corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.: 08CV2170

Judge St. Eve

Magistrate Judge Denlow

## DEFENDANT'S MOTION TO COMPEL ARBITRATION
## AND STAY FEDERAL PROCEEDINGS

Defendant Gibson Guitar Corp. ("Gibson"), respectfully moves this Court for an order,
pursuant to the Federal Arbitration Act (9 U.S.C. § 3), compelling Plaintiff Kuhn Capital, Inc.
("Kuhn Capital") to submit the instant claims as part of the ongoing arbitration between these
parties and staying the federal proceeding until that arbitration has concluded.

This motion is made upon the following grounds:

1.      On February 22, 2008, Kuhn Capital commenced this action, seeking to recover
fees for acting as Gibson's agent in connection with a potential acquisition, by filing its
Complaint for breach of contract and quantum meruit in the Lake County Circuit Court for the
Nineteenth Judicial Circuit.  Gibson removed to this Court on April 16, 2008.

2.      On the same day as it filed this litigation, Kuhn Capital filed an arbitration
proceeding before the American Arbitration Association also seeking to recover fees for acting
as Gibson's agent in connection with the same potential transaction.  A copy of the Arbitration
Demand is attached as Exhibit A.

3.      In its Complaint and the Arbitration Demand, Kuhn Capital alleges that it entered into a written contract with Gibson (the "Contract") to act as Gibson's agent to identify and screen potential acquisition targets.  (Compl. ¶ 7; Arbitration Demand ¶ 3.)  According to the Contract dated December 1, 2006, in exchange for these services, Kuhn Capital was entitled to a monthly retainer fee through February 28, 2007 as well as a percentage of the value of any successful purchase resulting from its efforts.  (Compl. ¶ 9, Exh. A.)  The Contract contains an arbitration provision, which provides:

> The parties agree to use their good faith efforts to resolve disputes arising out of the Agreement before resorting to binding arbitration.  Should the parties' good faith efforts fail to resolve the dispute, such dispute shall be resolved using binding arbitration pursuant to the rules of the American Arbitration Association. Each party will be responsible for its own costs of arbitration and related costs.

(*Id.* at Exh. A.)

4.      Kuhn Capital further alleges that the agreement was repeatedly amended to extend Gibson's obligation to pay retainer fees.  (Arbitration Demand ¶ 7.)

5.      Despite the written agreement containing an express arbitration provision, Kuhn Capital alleges, based on an email exchange with Gibson in the summer of 2007, that the dispute over a portion of its claim for fees for services performed on the potential acquisition transaction is not subject to arbitration.  Specifically Kuhn Capital alleges that in the summer of 2007, Gibson moved to acquire TC Group A/S ("TC"), a target identified by Kuhn Capital, and that Gibson requested Kuhn Capital provide further services to effectuate the transaction.  (Compl. ¶¶ 9-11.)  Ryan Kuhn ("Kuhn"), the principal for Kuhn Capital, emailed Gibson on August 6, 2007:

> We discussed today Kuhn Capital earning a $250K fee in addition to the currently agreed-upon fee in exchange for assuming responsibility in the TC due diligence process.  Our current agreement does not call for Kuhn Capital participation in the due diligence and closing negotiations process.

2

For the increased fee I would "do whatever has to be done" to close the deal.

In that function, I'm willing to act as a central coordinator and clearinghouse for all relevant information. Once due diligence information is forthcoming, I would also participate – as you see fit – in deciding how to respond to it. Such responses include suggestions on purchase agreement language and on Gibson's negotiating positions. I would also calculate the affect of such purchase agreement changes on Gibson's return on investment.

The object is to use the results of due diligence inquiries and purchase agreement language to maximize Gibson's return on investment.

Please indicate whether you agree with this proposal.

(*Id.* at Exh. C.)

6.      Kuhn Capital alleges that Gibson agreed to pay for these services in an email from

Roxanne Khazarian, Gibson's legal counsel, dated August 15, 2007, (Compl. ¶¶ 12, 14,)

I received confirmation from Henry this morning that an addition to the success fee in your retainer for closing on the TC transaction, as well as an additional 3 month extension of your retainer, is acceptable. *I will send you a revised amendment to close this out.*

(*Id.* at Exh. C) (emphasis supplied).

7.      Kuhn Capital acknowledges that the proposed amendment was not further

memorialized, (Compl. ¶ 13,) but alleges in its Complaint that the proposed amendment was

effective and that it is entitled to additional monthly retainer payments and an additional

$250,000 fee.  The allegations in the Complaint together with the exhibits Kuhn Capital attached

demonstrate that the parties intended for any obligations on Kuhn Capital and Gibson arising

from the merger transaction to be amendments to the Contract between the parties.

8.      Because any fees to which Kuhn Capital is entitled are recoverable under the

Contract and any amendment thereto, the breach of contract and quantum meruit claims in this

litigation should be heard as part of the ongoing arbitration, and federal proceedings should be

stayed in its favor.  To divide this dispute over fees to be paid for a single transaction between two forums would be terribly wasteful of the time of this Court and the time and money of the parties.

9.      Accordingly, this matter should be stayed pursuant to the Federal Arbitration Act, 9 U.S.C. § 3, and Kuhn Capital compelled to arbitrate the dispute in accordance with the arbitration provision contained in the Kuhn Capital/Gibson agreement.

* * *

WHEREFORE: This Court should order arbitration of this dispute and stay the action pending the arbitration.


Dated:  April 18, 2008                    Respectfully submitted,

                                          GIBSON GUITAR CORP.


                                          By:  /s/ Ranjit J. Hakim_____
                                                    One of Its Attorneys

                                          Michael J. Gill
                                          Ranjit Hakim
                                          Mayer Brown LLP
                                          71 S. Wacker
                                          Chicago, IL 60606
                                          (312) 782-0600

# EXHIBIT A

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION
## CHICAGO, COOK COUNTY, ILLINOIS

KUHN CAPITAL, INC.,         )
         )
      Claimant,      )
         )     Demand for Arbitration
    v.          )
         )     Hearing Location: Chicago, Illinois
GIBSON GUITAR CORP.,     )
         )
      Respondent.   )

### DEMAND FOR ARBITRATION OF KUHN CAPITAL, INC.

Claimant Kuhn Capital, Inc. ("Kuhn Capital"), by its attorneys, Ungaretti & Harris LLP, Demands Arbitration of the following claim for breach of contract against Gibson Guitar Corporation ("Gibson"):

1.     Kuhn Capital is an Illinois corporation with its principal place of business in Lake Forest, Lake County, Illinois.

2.     Gibson is a Delaware corporation with its principal place of business in Nashville, Tennessee. With specific regard to the contract with Kuhn Capital that is the subject of this demand for arbitration, Gibson transacted business with Kuhn Capital in Lake County, Illinois. Throughout the period including Gibson's business dealings with Kuhn Capital, for a significant time prior thereto and presently, Gibson also generally transacts business throughout the State of Illinois, including specifically in Lake County, Illinois.

3.     On December 1, 2006, Kuhn Capital and Gibson entered into a merger and acquisition intermediary agreement (the "Agreement"), a true and correct copy of which is attached as Exhibit A.

4.     The Agreement was formed, wholly or in part, in Lake Forest, Lake County, Illinois. Kuhn Capital performed the Agreement, in substantial and material respects from its offices in Lake Forest, Lake County, Illinois. At all relevant times, Gibson knew that Kuhn Capital would render, and was rendering, services to Gibson in furtherance of the purposes of the Agreement within and from the City of Lake Forest, Lake County, Illinois.

5.     According to the Agreement's terms, Gibson appointed Kuhn Capital its exclusive agent for purposes of facilitating Gibson's purchase of a vendor of musical instruments, associated electronics, or accessories (a "Potential Target" as defined by the Agreement). *See* Agreement, p. 1, The Agreement defined as a "KC Candidate" any Potential Target with which Gibson's contact was initiated by Kuhn Capital. The Agreement further provided, among other things, that Kuhn Capital would receive a success fee if Gibson consummated a transaction, whether in one or a series of transactions, for the acquisition of a KC Candidate. *See* Agreement ¶¶ 1-4. The Agreement states that Kuhn Capital's success fee, calculated as a percentage of a covered transaction's value, is due and payable in cash to Kuhn Capital by Gibson upon the consummation of Gibson's purchase of a KC candidate. Agreement ¶ 4.

6.     Gibson was also required to pay Kuhn Capital a $10,000 retainer fee on the first of each month during the term of the Agreement. Agreement ¶ 3(A). In accordance with the Agreement's terms, retainer fees paid by Gibson would later be offset from, thus reduce, any Success Fee that became due to Kuhn Capital. Agreement ¶ 3(B).

7.     Pursuant to Section 3 of the Agreement, Gibson made 11 retainer payments to Kuhn Capital between December 2006 and October 2007 totaling $110,000.

8.    Gibson did not make retainer payments as required by the Agreement in November 2007, December 2007, January 2008 or February 2008. The total unpaid balance of retainer payments due and owing Kuhn Capital from Gibson is, therefore, $40,000.

9.    Following execution of the Agreement by authorized agents of both Gibson and Kuhn Capital, Kuhn Capital performed all material terms and conditions thereof, specifically identifying The TC Group A/S, a Danish corporation ("TC"), as a KC Candidate and fully-qualified Potential Target for purposes of the Agreement, initiating contact with and preliminarily screening TC, introducing Gibson to TC, providing ongoing support, advise and counsel to Gibson with respect to its acquisition of TC and otherwise facilitating Gibson's purchase of TC in accordance with the Agreement.

10.    As a direct consequence and proximate result of Kuhn Capital's performance of the Agreement, on July 30, 2007 TC and Gibson entered into a Letter of Intent and Agreement whereby Gibson would acquire TC (the "LOI"). A true and correct copy of the LOI is attached as Exhibit B. The LOI listed the terms and conditions of the acquisition. According to the LOI, the total transaction value of Gibson's acquisition of TC would be in excess of $68,000,000.00 (sixty-eight-million dollars).

11.    TC was not the only Target Company identified by Kuhn Capital. Kuhn Capital has identified at least an additional 41 Target Companies for Gibson, and consequently if Gibson consummates a covered transaction with any of these additional Target Companies, Gibson will be obligated under the Agreement to pay Kuhn Capital all associated success fee in accordance with the Agreement's terms.

12.    An original closing date for Gibson's acquisition of TC of December 17, 2007 was, on information and belief, postponed to late February 2008, and therefore Kuhn Capital is informed and does believe that a Gibson-TC closing is imminent.

13.    In late November 2007, through Henry Juszkiewicz ("Mr. Juszkiewicz"), its Chairman and CEO, Gibson breached the Agreement with Kuhn Capital by expressly and unequivocally repudiating Gibson's obligation to pay Kuhn Capital the success fee due it for Gibson's acquisition of TC. In an email exchange with Ryan Kuhn ("Mr. Kuhn"), a principal of Kuhn Capital, on November 29, 2007, while refusing to pay Kuhn Capital ongoing fees due it in connection with services rendered to Gibson adjunct to its acquisition of TC, Mr. Juszkiewicz claimed "surprise" that Gibson's acquisition of TC included both TC assets and current liabilities, and summarily repudiated Kuhn Capital's Agreement with Gibson and Kuhn Capital's entitlement to the case success fee upon closing of the TC transaction stating: "Kiss your fee fee good bye." True and correct copies of this e-mail exchange are attached as Exhibit C.

14.    On December 12, 2007, Mr. Kuhn sent another e-mail message to Mr. Juszkiewicz requesting that Gibson pay Kuhn Capital the fees due it, and, further, rescind its repudiation of Kuhn Capital's entitlement to its success fee upon consummation of the Gibson-TC transaction. A true and correct copy of the December 12, 2007 e-mail is attached as Exhibit D. To date, however, Mr. Juszkiewicz and Gibson have entirely ignored this communication from Mr. Kuhn, instead standing on Mr. Juszkiewicz' admonition to Kuhn Capital, "Kiss your fee fee good bye."

15.    Kuhn Capital fully performed all of its obligations under the Agreement and is, therefore, entitled to a $950,000 success fee in cash upon the imminent closing of Gibson's acquisition of TC.

16.     Through Mr. Juszkiewicz, Gibson breached its Agreement with Kuhn Capital by anticipatorily repudiating the Agreement and specifically its provision entitling Kuhn Capital to the success fee referable to the Gibson-TC transaction.

17.     Paragraph 9 of the Agreement provides that disputes arising from it must be submitted to binding arbitration pursuant to the rules of the American Arbitration Association.

WHEREFORE, Claimant Kuhn Capital, Inc. hereby demands arbitration of its claim for Gibson's deliberate and unjustified breach of the Agreement, and prays an arbitral award and judgment and be entered in its favor and against Gibson for:

A.     Kuhn Capital success fees in an amount in excess of $950,000 plus interest;

B.     Kuhn Capital retainer fees in an amount in excess of $40,000 plus interest;

C.     a declaration that Kuhn Capital identified at least 41 additional Target Companies, and that Kuhn Capital is entitled, under the Agreement, to all related success fees if Gibson ever consummates a covered transaction or transactions with any of such additional Target Companies; and

D.     such other or further relief in Kuhn Capital's favor and against Gibson as may be within the Arbitrator's authority to provide and which the Arbitrator deems just, proper and equitable in the premises, including without limitation its fees and expenses incurred in initiating and prosecuting this arbitration.

February 22, 2008                              Respectfully submitted,

                                                      KUHN CAPITAL, INC.

                                                      By: _____
                                                              One of its attorneys

David Bronner
Nicholas Anaclerio
Antonio Caldarone
UNGARETTI & HARRIS LLP
3500 Three First National Plaza
Chicago, Illinois 60602
(312) 977-4400
(312) 977-4405 (facsimile)

EXECUTIVE OFFICE                    PAGE  01

309 Plus Park Blvd
Nashville, TN 37217
615-871-4500 ext. 3455
Fax 615-884-9527
www.Gibson.com
sarah.ritter@gibson.com



# Fax

| To: | Kuhn Capital | From: | Henry Juszkiewicz |
|---|---|---|---|
| Fax: | 847-457-2401 | Pages: | 9 |
| Phone: | | Date: | 11/29/06 |
| Re: | Executed document | cc: | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

EXHIBIT
A



**KUHN CAPITAL**
m&a for the information age

Henry Juszkiewicz
Chairman and Chief Executive Officer
Gibson Guitar Corporation
309 Plus Park Blvd.
Nashville, TN 37217

December 1, 2006

Letter Agreement
Confidential

Dear Henry,

This exclusive agreement ("Agreement") between Gibson Guitar Corp. incorporated in Delaware ("Gibson"), and KC Capital, Inc., a mergers and acquisition intermediary incorporated in Illinois ("KC"), is entered into this 1st day of December, 2006, and will expire on February 28, 2007 ("Retainer Period"). The Agreement shall expire at the end of the Retainer Period unless the parties agree in writing to extend this Agreement for additional 90 day periods under the same terms defined herein.

The parties are forming this relationship to facilitate Gibson's purchase of a vendor of musical instruments, associated electronics, or accessories (a "Potential Target"). More specifically, KC must focus on Potential Targets with the characteristics as given in Exhibit A, which is incorporated herein and made an integral part of this Agreement. Notwithstanding the foregoing, Dongbei Piano Company, Kingsburg Piano Company, and Garrison Guitars shall be excluded from the definition of Potential Target. The scope of KC activities under this agreement include: (a) target identification, (b) initial target contact and preliminary screening, (c) introduction of Gibson to qualified targets, (d) ongoing support as requested by Gibson during business and financial case development, (e) advice and counsel as to general market conditions supporting target viability, and (f) advice and counsel as needed in the negotiation of purchase terms and conditions.

For purposes of this Agreement, the term "Purchase" means the consummation of a transaction by Gibson whether in one or a series of transactions, for the acquisition of KC Candidates pursuant to the terms of a definitive written agreement.

The term "KC Candidate" means any Potential Target with whom contact with Gibson was initiated by KC but excluding any Potential Target with which Gibson has independently initiated purchase discussions during the period of one hundred eighty ( 180 ) days or less prior to the date of this Agreement. A list of these excluded Potential Targets is attached as Exhibit B. Gibson may, at its discretion, subsequently remove Potential Targets from this list by written notice to KC.

The parties further agree to the following terms and conditions:

     1) During the Retainer Period, Gibson hereby appoints KC as its exclusive agent in its search for KC Candidates.

     2) KC agrees to use commercially reasonable efforts to successfully identify Potential Targets for the consummation of a Purchase by Gibson including, without limitation, the following:

         A) Maintain in strict confidence and use only solely for the purposes set forth in this Agreement, all non-public Gibson information, including without limitation, the fact that

NOV-29-2006 03:37 FROM:KUHN CAPITAL    EXECUTIVE OFFICE    PAGE 03
18474572401                    TO:16158849499    P.3

Gibson may be seeking a Purchase or has entered into Purchase discussions with any Potential Target/KC Candidate;

B) Effectively but discretely promote Gibson, its business prospects and its value to KC Candidates;

C) Seek KC Candidates with the characteristics listed in the attached Exhibit A.

D) Effectively organize, coordinate and drive the process of Potential Target/KC Candidate identification, selection, description and presentation to Gibson.

E) Communicate with Gibson regarding the search process, including continual and timely updates of Potential Target/KC Candidate status.

F) The parties understand that Gibson will assume responsibility for: (i) responding in a timely manner to KC's presentation of any KC Candidates; (ii) negotiating with KC Candidates after they are introduced to Gibson by KC; (iii) performing due diligence on KC Candidates; (iv) informing KC of any Potential Targets of which Gibson is aware; and (v) obtaining appropriate tax, legal and accounting advice regarding any potential Purchase. Gibson understands that KC is not licensed or qualified to provide expert legal and accounting advice, and Gibson agrees that KC shall have no responsibility for providing legal or accounting advice.

3) Gibson agrees to provide KC:

A) With a Retainer Fee of $30,000, which shall be payable as follows: (i) $10,000 shall be payable by Gibson to KC upon the execution of this Agreement, and (ii) additional $10,000 payments shall be due on January 1, 2007 and February 1, 2007. KC will timely furnish Gibson with invoices for any fees and reimbursements due.

B) All Retainer Fee payments paid by Gibson and received by KC shall be deducted from any Success Fee that becomes due and payable by Gibson to KC as set forth in Section 4 below.

4) If Gibson closes an acquisition with a KC Candidate provided by KC, Gibson agrees to compensate KC as follows:

A) With a Success Fee payable in cash but only upon the condition precedent that Gibson consummates a Purchase of a KC Candidate on the terms and conditions set forth in this Agreement. The Success fee shall be payable in pro-rata installments on a pro-rata basis at closing on a Purchase and at the time of payment of any subsequent installment as set forth in paragraph 4 (e) hereinafter. The Success Fee will be calculated in proportion to the Transaction Value (as defined below) according to the following schedule:

| Transaction Value | Success Fee |
|---|---|
| Up to $5 million | $150,000* |
| $5 million to $10 million | $150,000 plus 2% of Value exceeding $5 million |
| $10 million - $25 million | $250,000 plus 1% of Value exceeding $10 million |
| More than $25 million | $400,000 plus 0.5% of Value exceeding $25 million Total success fee, net of retainer, not to exceed $1,000,000** |

2

*[In no event shall KC's Success Fee total less than $150,000 per Purchase net of any Retainer Fees.]

** [In no event shall KC's Success Fee total more than $1,000,000 per Purchase net of any Retainer Fees.]

B) For the purposes of this Agreement, "Transaction Value" shall mean, with respect to any Purchase, (i) the total amount (whether paid in cash and/or other property, and valued at fair market value if not paid in cash), without duplication, paid or payable, directly or indirectly, to, or for the benefit of, the KC Candidate (including any subsidiary thereof) and/or its security holders, including amounts paid or payable to holders of options, warrants or convertible securities, in respect of the capital stock (or other ownership interests) or assets of the KC Candidate, and also including amounts loaned to the KC Candidate, plus (ii) the face amount of any indebtedness of the KC Candidate that (A) in a sale of assets, is actually repaid by Gibson in connection with the Purchase, or (B) in any other Purchase, is assumed or repaid by Gibson in connection with the Purchase or remains outstanding after consummation of the Purchase; minus (iii) any cash on the balance sheet of the KC Candidate at the time the Purchase is consummated that is acquired by Gibson in the Purchase. "Transaction Value" shall include any consideration held in escrow and future payments which are contingent upon the performance of the KC Candidate or any successor to the KC Candidate, and shall also include any payments to the KC Candidate or to management of the KC Candidate on account of an agreement not to compete or similar restriction; provided any sales or change of control bonuses paid to management or in exchange for agreements not to compete shall not be included in "Transaction Value". In the event a Purchase is accomplished through a recapitalization, reorganization, restructuring or other similar transaction (including, without limitation, through negotiated repurchases of the KC Candidate's securities, an issuer tender offer, an extraordinary dividend or distribution, a spin-off, split-off or other similar transaction), the Transaction Value shall also include the value of the KC Candidate's equity securities or other equity interests retained by its security holders.

C) KC's Success Fee is due and payable upon the consummation of a Purchase of a KC Candidate in accordance with the terms and conditions of this Agreement.

D) If any portion of the Transaction Value is deferred, or contingent upon future performance by the KC Candidate or Gibson, such portion will be treated as part of the Transaction Value, and Gibson will make incremental payment of any deferred amount due on the Success Fee to KC when Gibson pays to, or accepts from the KC Candidate, the deferred or contingent portions. Any amounts held in escrow post-closing will not be treated as deferred or contingent payments.

E) Notwithstanding the above, Gibson and KC may mutually agree at any time after the consummation of a Purchase upon the present value of any deferred or contingent payments related to a Purchase, and therefore the present value of KC's Success Fee related to such payments. In such case, Gibson may discharge all liability for deferred or contingent payments of the Success Fee by paying KC the agreed-upon present value.

F) With reimbursement of documented travel expenses accrued by KC in pursuit of KC Candidates during its Retainer Period not to exceed reasonable and customary direct out of pocket costs reasonably incurred in accordance with direction from Gibson, and in any case not to exceed the aggregate amount of $3,000 throughout the Retainer Period without prior written Gibson authorization.

3

5) Gibson will have full access to KC Candidates during the KC's Retainer Period and thereafter for the purpose of doing all things necessary to successfully evaluate, negotiate, and close a Purchase transaction provided that Gibson timely notifies KC in advance of such contact. Notwithstanding the above, Gibson will have full access to all KC candidates to further the pursuit of normal Gibson trade activities without this notification requirement.

6) KC hereby indemnifies and shall defend and hold harmless Gibson, its affiliates and all of their respective employees, directors, officers, agents, representatives and successor entities for the acts or omissions of KC or its breach of this Agreement. Gibson will indemnify KC and all of its respective employees, directors, officers, agents, representatives and successor entities for any third-party claims against KC based on Gibson's willful, fraudulent, or grossly negligent actions.

7) The parties agree that an executed facsimile of this Agreement carries the same legal obligations as an original.

8) This is the entire agreement between the parties and supersedes any prior agreements. Any alterations or modifications of this Agreement must be in writing and signed by both parties.

9) The parties agree to use their good faith efforts to resolve disputes arising out of the Agreement before resorting to binding arbitration. Should the parties' good faith efforts fail to resolve the dispute, such dispute shall be resolved using binding arbitration pursuant to the rules of the American Arbitration Association. Each party will be responsible for its own costs of arbitration and related costs.

10) The parties hereby acknowledge and agree to waive any and all liabilities for consequential, incidental, and/or punitive damages which they may have against the other party, irrespective of the foreseeability or nature of such damages.

11) No failure or delay on the part of any party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of any representation, warranty or agreement herein, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right. All rights and remedies existing under this Agreement or the Schedules attached hereto are cumulative to, and not exclusive of, any rights or remedies otherwise available. In the event of any conflict between the terms of this Agreement and Exhibits attached hereto, the terms of this Agreement shall prevail. KC acknowledges and agrees that this Agreement calls for the performance of services as an independent company and that KC shall be responsible for payment of all subject taxes or fees as required. Nothing herein contained shall create or be deemed to create any relationship of agency, partnership or joint venture between Gibson and KC. This Agreement shall be construed, and the obligations of the parties hereto shall be determined, in accordance with the laws of the State of Tennessee, as if made between residents of the state and to be performed fully therein.

4

NOV-29-2006 03:39 FROM:KUHN CAPITAL    18474572401    TO:16158849490    P.6

AGREED TO AND EXECUTED THIS 1ST DAY OF DECEMBER, 2006.

GIBSON GUITAR CORP.

By: _____
Henry Juszkiewicz
Chairman and Chief Executive Officer
Gibson Guitar Corp.
309 Plus Park Blvd.
Nashville, TN 37217

KUHN CAPITAL, INC.

By: _____
Ryan Kuhn
President
Kuhn Capital, Inc.
500 Western Ave., Suite 200
Lake Forest, Illinois 60045

5

NOV-29-2006 03:39 FROM:KUHN CAPITAL    18474572401    TO:16153849499    P.7

## Exhibit A

### Gibson M&A Rationale & Target Criteria

#### Gibson M&A Rationale

- To more rapidly and cheaply increase market share than is possible through organic growth. We define the market as the activities of making and listening to music. "Making" consists of:
  - Composing
  - Playing
  - Integrating/collaborating.
  - Learning
  - Producing (transmitting, promoting, publishing, packaging, distributing, etc.)
- To exploit new technologies and other capabilities now controlled by M&A targets.
- To enter new market segments, or to eliminate real or potential competitors.

#### Gibson Benefits Sought

Margin enhancement through economies in:

1) Marketing (brand leverage)
2) Manufacturing (gains in either efficiency or effectiveness)
3) Distribution (increased channel volume, new channels)
4) Accelerated technology development (buy vs. make)

#### Gibson Sectors Searched (in rough declining priority)

1) Electronic Technologies
   a. Amps, signal processors
   b. Speakers (e.g., Klipsch)
   c. Synths, workstations
   d. Mikes
   e. Mixers
   f. Recorders
   g. Accessories (cables, etc.)
2) Instruments
   a. Guitars (e.g., Fender)
   b. Basses
   c. Drums
   d. Pianos
3) Instrument Accessories (strings, cases, etc.)

NOV-29-2006 03:40  FROM:KUHN CAPITAL        18474572401         TO:16150049499        P.8

<u>Gibson Target Criteria</u>
Companies capable of satisfying the above characteristics in addition to:
1) Value
   a. In cash, less than $20M
   b. In equity, less than Gibson's value (maintain control)
2) Location (in declining priority)
   a. US
   b. China
   c. Europe
3) Availability: within six months
4) Financial performance
   a. For a Going Business
      i. Profitable
      ii. If not profitable, clear path to profitability and positive short-term cash flow
   b. For an Asset
      i. Immediate or rapid application to current operations

5) Senior Management Retention
   a. Willing to stay on up to two years when possessing valuable proprietary knowledge or skill
   b. Needn't stay on more than six months (through integration) when such knowledge or skill not particularly valuable

## Exhibit B

### Excluded Potential Targets

Ableton AG
Schönhauser Allee 6-7
D-10119 Berlin
Germany

Hoshino Gakki Co. Ltd
3-22 Shumoku-cho, Higashi-ku
Nagoya, 461-8717
Japan

Line 6, Inc.
26901 Agoura Road
Agoura Hills, CA
91301-2513
United States

Native Instruments Software
Synthesis GmbH
Software Synthesis GmbH,
Schlesische Straße 28
D-10997 Berlin
Germany

Cakewalk
268 Summer St, 8th Floor
Boston, MA 02210
United States

J. D'Addario & Company, Inc.
595 Smith St
Farmingdale, NY 11735
United States

LOUD Technologies Inc.
16220 Wood Red Rd NE
Woodinville, WA 98072
United States

Rohrol Corporation
20 Sonezakishinchu 1-chome, Kita-
ku
Osaka, 530-0002
Japan

Drum Workshop
1450 Lunt Ct
Oxnard, CA 93030
United States

Latin Percussion, Inc.
160 Belmont Ave.
Garfield, NJ 07026
United States

Marshall Amplification plc
Denbigh Road, Bletchley,
Milton Keynes, MK1 1DQ
England



GIBSON GUITAR CORP.
309 PLUS PARK BLVD.
NASHVILLE, TN 37217


Anders Fauerskov
Chief Executive Officer
The TC Group A/S
Sindalsvej 34
Risskov, Aarhus
Denmark

July 30, 2007

## Letter of Intent and "No-Shop" Agreement

Dear Anders:

We (Gibson) are pleased to submit this Letter of Intent and Agreement (Letter and Agreement) as an expression of our interest in effectively acquiring The TC Group A/S. We are excited by the strategic and management promise of a combination and we would intend to consummate this transaction promptly, certainly before September 15, 2007.

Contemplated Transaction
In our terms below, we have assumed that all of your transaction costs and any payments due to your employees or affiliated parties as a result of our purchase are borne by TC shareholders.

This proposal is based upon, and assumes the accuracy and completeness of, the information contained in the materials you have provided us. This proposal is also contingent upon our receipt of a commitment letter from a bank with terms satisfactory to us relating to the debt financing for this transaction. We shall provide you with documentation of the feasibility of such financing as soon as is practicable, but in no event later than August 31, 2007.

Consistent with mutual discussions to date, and subject to the terms hereof, we are contemplating purchasing from your holding company TC Group all its assets such as plant, property, and equipment presently used or useable in the operation of TC Group's business or of its affiliates, accounts receivable, intellectual property and all intangible assets, real estate, (including all rights to leasehold), all contract rights and rights to government incentives, inventory, equipment, prepaid expenses and other capital assets, all licenses, patent rights, know-how, and other commercial or proprietary information associated with TC Group or its affiliates' operations, the liability reserves, current liabilities of TC Group as well as ownership shares in all of your operating subsidiaries excluding the ownership shares in the TC Applied Technologies subsidiary (collectively the "Assets") with the assets of TC Group acquired at current book value and the balance subject to an allocation across the equity of the shares acquired.

1

EXHIBIT
B

warranties and indemnifications as described in a definitive purchase agreement. TC Group would execute a non-compete agreement running to the benefit of Gibson Guitar Corp. and its affiliates for a period of three (3) years. Gibson also would endeavor to secure similar non-compete agreements from the principal individual shareholders of TC Group. Notwithstanding the foregoing, the parties would work together to (i) review the structure of this proposed asset acquisition, and in particular, the tax impact on each party and, (ii) craft a final structure that is mutually beneficial with adjustments to the terms set forth herein as appropriate so long as there is no negative impact to TC Group.

We may assume some or all of TC's long-term liabilities subject to transferability, relative cost of capital and the composition of Gibson's post-close balance sheet. If we do so, such values will be deducted from the Closing Payment as defined below.

We may seek insurance from a third-party against the risk of future reserve liability exceeding your current reserve value. Such insurance cost, if any, would similarly be deducted from our purchase price in an amount not to exceed $100,000.

We consider all EBITDA, working capital and long-term liabilities referred to below to be calculated in accordance with TC Accounting Principles defined herein as generally accepted Danish accounting policies excluding amortization for development costs. We are defining the term "this year" to mean your fiscal year closing June, 2007. Payments due TC based on "earn-out" formulas are payable promptly after either Gibson's annual audit, or four months after the earn-out period terminates, whichever due date occurs first. All dollar amounts herein reflect a dollar conversion rate to the Danish Kroner of 0.179833 while the final conversion rate used shall be the rate applicable as of the date of execution of the purchase and sale agreement

1) At close we would apply a multiple of 7.5 to the EBITDA of the Assets for the fiscal year ended June 30, 2007 which you estimate at $9.1 million, generating an estimated initial value of approximately $68.25 million.
2) Gibson will assume the risk of reserve liabilities. To account for that risk, Gibson will reduce the total purchase price by $3.1 million resulting in a value of about $65.15 million.
3) From this $65.15 million value shall be deducted an amount equal to 9.4 multiplied by the difference between the interest portion on the mortgage pre-sale for, and the lease rate post-sale for, that certain real estate associated with TC Electronics to be the subject of a sale and leaseback transaction (the "Real Estate Adjustment Amount").
4) The amount resulting from the calculation above shall be the Closing Payment.
5) In addition, Gibson shall pay a contingent earn-out value of not more than $17.1 million for a total value not exceeding $82.1 million minus the Real Estate Adjustment Amount, subject to any applicable further adjustments (such total defined as the "Total Purchase Price").
   a) We would subsequently apply an "earn-out" multiple of 2.14 to the amount by which the Asset's EBITDA increases in fiscal year ending June 30, 2008 as compared to fiscal year ending June 30, 2007. You estimate this EBITDA increase at $3.9 million, generating a subsequent payment of about $ 8.5 million.
   b) We would subsequently apply an "earn-out" multiple of 1.552 to the amount by which these subsidiaries' EBITDA increases for fiscal year ending June 30, 2009 over EBITDA for the fiscal year ending June 30, 2007.

6) Regarding structure as noted above, our present closing compensation will be in the form of cash, or cash and Gibson's assumption of subsidiaries' debt:

   a) Gibson would receive a holdback in the amount of 7.5%. At close we would fund with cash an indemnity escrow with a term of 18 months in the amount of about 3.75% of the Total Purchase Price, (the exact proportion of escrow to total prospective purchase price is subject to due diligence), and the balance of the holdback if any would be offset against the earn-out for up to December 31, 2009. The cash portion of escrow would bear interest at market rates for the benefit of TC. Such escrow would be subject to commercially reasonable terms relating to Gibson's right to drawdown, including but not limited to minimum and maximum threshold levels for drawdowns after exhaustion of the dispute resolution procedures set forth in the final purchase and sale agreement. The minimum amount of indemnity shall be in the range of 2-5% and the maximum amount of indemnity shall be in the range of 15-20% of the Total Purchase Price.

   b) The Closing Payment for the Assets is predicated upon a value for net working capital (which shall mean current assets minus current liabilities) equal to 16.7% times income statement expenses, which shall be the cost of goods sold and SG&A, for the trailing twelve months ( the "Working Capital Test "). Any amount of net working capital above or below the Working Capital Test would increase or decrease respectively dollar for dollar the Closing Payment.

   c) Should we assume some or all of TC's long-term liabilities, at close we would pay TC and into escrow cash with an estimated value that reflects a dollar-for dollar-reduction from the Closing Amount equal to the amount of long-term liabilities assumed.

Before close, should a TC employee choose not to accept employment with Gibson, TC would incur the related termination costs, if any. Finally, the purchase price and related terms above are contingent upon TC Group assisting in securing the intent of key TC employees continuing with Gibson for a minimum period to be determined.

No-Shop Agreement

In consideration of the substantial expense incurred by Gibson in pursuit of its TC due diligence investigation, and subject to the execution of a final purchase and sale agreement no later than October 1, 2007, the "Termination Date"), TC agrees that until October 1, 2007 Gibson has the exclusive right to negotiate to acquire the Assets provided Gibson abides by the provisions outlined in this Letter and Agreement. TC acknowledges and agrees that it will not sell the Assets to any other purchaser other than Gibson until October 1, 2007.

Specifically, without prior written authorization from Gibson, neither TC, its officers, directors, agents, nor stockholders will, directly or indirectly, through any officer, director, stockholder, agent, or otherwise: (i) solicit or initiate, directly or indirectly, or encourage submission of inquiries, proposals, or offers from any potential acquirors (other than Gibson) relating to a merger, consolidation, reorganization, recapitalization or similar transaction of TC or any disposition of the business or the assets or securities of TC, or any part thereof; or (ii) participate in any discussions or negotiations regarding, or furnish to any person any information with respect to the merger, reorganization, recapitalization, consolidation or similar transaction of TC or the disposition of the business or the assets or any securities of TC or any part thereof.

3

Notwithstanding the immediately preceding sentence, if Gibson provides written notice to TC that discussions with respect to a potential acquisition are terminated, the Termination Date shall be the date of such written notice.

TC will immediately notify Gibson of any contact between TC, its officers, directors, agents or stockholders with any other person regarding any such offer or proposal or related inquiry.

TC represents and warrants (as evidenced exclusively by execution of this Letter and Agreement) that it has been authorized by its Board of Directors (acting on behalf of TC and its more than 10% stockholders) and its shareholders to enter into this Letter and Agreement. TC also represents that the execution of this agreement does not conflict with or contravene any other agreement or arrangement to which it is a party.

For the term of this Letter and Agreement, TC agrees to cooperate with Gibson and its representatives to expend commercially reasonable efforts as they pursue their due diligence investigations and to provide Gibson with reasonable access to certain key executives and other relevant parties.

The parties agree to use commercially reasonable efforts to (i) obtain all necessary approvals, consents, waivers and clearances from governmental authorities, and (ii) complete all other matters relating to the proposed acquisition and close the proposed acquisition by October 1, 2007 contingent on regulatory approval.

TC agrees to conduct its business during the period commencing as of the date of this Letter and Agreement until Termination Date in substantially the same manner as it is presently conducted and to make or commit to no material changes in the business. Specifically, TC shall not, among other things, without the consent of Gibson, do any of the following: enter into, assume or become bound or obligated by any agreement, contract or commitment or extend or modify the terms of any presently existing agreement which are not in the ordinary course of business and (a) increases the compensation of any employee of the Company, except salary increases in the ordinary course of business and consistent with past practice, (b) involves any payment or obligation to any affiliate of the Company, or (c) involves the sale of any material non-cash assets; or (iii) establishes any new, or modifies any existing, employee benefit, compensation or stock plan; or (iv) declares or pays any dividends or makes any distribution of assets to the shareholders or pays any bonuses or makes any other extraordinary payments to its officers, directors or employees, which could result in a material adverse change to the business of TC Group as compared to the status as of June 30, 2007 except as specifically contemplated by this Letter and Agreement.

TC shall promptly notify and consult with Gibson regarding any such acts or events regarding the business which could be construed as being outside the course of TC's business as normally conducted. TC understands that such acts or events, should they occur, may result in a decreased purchase price value or cause Gibson to terminate this Letter and Agreement.

Gibson and TC will each be solely responsible for and bear all their respective expenses, including, without limitation, expenses of legal counsel, accountants, and other advisors incurred at any time in connection with the Letter and Agreement, or while pursuing or consummating the definitive purchase agreement and the transactions contemplated thereby. No broker's or finder's fees have been or will be incurred by Gibson, TC or its shareholders other than those disclosed in connection with the review of

liabilities incurred in connection with any such advisor which it has retained or disclosed.

The parties hereby repeat and reaffirm the obligations of confidentiality as set forth in the Mutual Non-Disclosure Agreement signed by the parties as of March 6, 2007.

Other Matters
This Letter and Agreement shall be governed by and construed in accordance with the domestic laws of the State of Tennessee without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Tennessee. This choice of law shall not be deemed as a precedent for the choice of law of a final purchase and sale agreement, which shall be governed by Danish law.

This Letter and Agreement may be executed in counterparts, each of which shall be deemed an original, and such counterparts together shall constitute one and the same instrument. In order to facilitate the execution of this Letter and Agreement, signatures may be exchanged via facsimile or in a Portable Document Format (pdf) attachment transmitted via e-mail.

The terms we suggest here are contingent on the satisfactory results of final due diligence to be conducted by Gibson (such results deemed to be "satisfactory" at Gibson's sole discretion), and are also subject to the ability of both parties to negotiate final terms and conditions acceptable to their Boards of Directors. Except for the terms of this Letter and Agreement relating to confidentiality, non-solicitation, operation in the ordinary course, no fees or costs and choice of law, which shall survive termination of this Letter and Agreement, the parties expressly acknowledge that (i) this Letter and Agreement is not intended to be and does not constitute a binding agreement of any kind, notwithstanding any course of conduct by the parties after the date of acceptance of this Letter and Agreement, and that (ii) in connection therewith, neither party is bound legally to the contemplated transaction until a definitive purchase agreement is executed. Both parties understand that this Letter and Agreement is not intended to, and does not, constitute an agreement by Gibson to purchase TC or an agreement by TC to sell the assets referenced above to Gibson.

The terms suggested here are further subject to the giving of any and all notices to, and the obtaining of all necessary approvals, consents, waivers and clearances from governmental authorities and from parties to material agreements, including parties to all TC leases, where the other party has a right to approve the assignment of such agreement to the Purchaser.

This Letter and Agreement shall be withdrawn and be of no further force or effect if it is not executed and delivered by you to Gibson before the close of business on July 30, 2007.

If the terms and conditions proposed herein are acceptable to you, please sign where indicated below, initial each page, and return a copy of this document to me.

Anders, we are eager to proceed and look forward to commencing the due diligence and purchase agreement discussions immediately.


Very Truly Yours,

**GIBSON GUITAR CORP.**

By: _____

Name: Henry Juszkiewisz
Title:   Chairman and Chief Executive Officer

**DULY EXECUTED AND AGREED:**
**THE TC GROUP A/S**

By: _____

Name: Anders Fauerskov
Title:   Chief Executive Officer

Date: _____

**DULY EXECUTED AND AGREED:**
**THE TC GROUP A/S**

By: _____

Name: Hans Houlind
Title:   Chairman

Date: _____

6

Anders, we are eager to proceed and look for ward to commencing the due diligence and purchase agreement discussions immediately.

Very Truly Yours,

GIBSON GUITAR CORP.

By:

Name: Henry Juszkiewisz
Title: Chairman and Chief Executive Officer

DULY EXECUTED AND AGREED
THE TC GROUP A/S

By:

Name: Anders Fauerskov
Title: Chief Executive Officer

Date: 30. 7. 2007

DULY EXECUTED AND AGREED:
THE TC GROUP A/S

By:

Name: Hans Houlind
Title: Chairman

Date: 30. 07. 2007

6

-----Original Message-----
From: Henry Juszkiewicz [mailto:Henry.Juszkiewicz@gibson.com]
Sent: Thursday, November 29, 2007 3:08 PM
To: Ryan Kuhn
Subject: RE: TC

Do not discuss this with anyone.  You assured me it would be inappropriate
to talk to TC and yet you have done so anyway.

Get a lawyer.

Do not talk to anyone on this deal Ryan.


-----Original Message-----
From: Ryan Kuhn [mailto:rkuhn@kuhncap.com]
Sent: Thursday, November 29, 2007 9:33 AM
To: 'Henry Juszkiewicz'
Subject: RE: TC

Given this response, I presume you are unavailable to acquiring CL or
working a compromise. This despite that fact that documentation supports
your doing so.

**EXHIBIT**

C

And given your closing comment below, I feel it would be inappropriate for
me to participate in the upcoming conference call with TC until we clarify
our relationship.

Ryan

_____
Kuhn Capital
847/457-2400 (o)
773/330-7547 (c)
www.kuhncap.com


-----Original Message-----
From: Henry Juszkiewicz [mailto:Henry.Juszkiewicz@gibson.com]
Sent: Thursday, November 29, 2007 9:25 AM
To: 'Ryan Kuhn'
Subject: RE: TC

What is unbelievable is you and consequently our team did not follow my
directives. I had several heated discussions with you saying that debt is
debt and must be removed from enterprise value regardless of how it is
defined. This is standard pracrice in the industry.

Instead of a simple statement of price and multiple calculation YOU
introbuced confusing issues taking the eye off the ball.

We are not paying more than what I agreed to and told you and you will
suffer the consequences of your inability to communicate simply.

I am in an airport and unable to deal with this surprise today.

Kiss your fee fee good  bye.

Henry Juszkiewicz
>From Good Link Pocket Pager

 -----Original Message-----
From:  Ryan Kuhn [mailto:rkuhn@kuhncap.com]
Sent:  Thursday, November 29, 2007 09:09 AM Central Standard Time
To:   Henry Juszkiewicz
Subject:    TC

Henry,

You have several options and I advise you to exercise one or a combination
of them immediately. Conferences between your Gibson team and TC like that
planned today won't cut it and will probably piss TC off even more.

1)    Walk and possibly get sued.

2)    Convert the current liabilities you're buying (worth about $19M)
into deeply subordinated seller's paper. SPP tells me that won't threaten
the current bank deal.

3)    Convert the CL into Gibson stock. TC's at about $9.5M EBITDA and
Gibson is - after the deal - at about $49.5M. Assume for the sake of
simplicity that the same EBITDA multiple applies to both companies. At 9.4x,
that values TC at $89M and you at $465M. So $19M equals about 4% of
post-deal Gibson stock.

4)    Push for a lower purchase price multiple. As you've heard from me many times before, you're paying a rich price. TC's worth more like 8x EBITDA. But this far into the game, TC's gonna be a lot less flexible than they could have been when I was carping about the multiple, and then about inventory, pension liabilities, etc. Nonetheless, you may be able to shave $5M off the current price by positioning the gap as a mutual problem.

Whatever works here is going to require your direct involvement. The LOI, the funds flow documents, the net NWC test, the equity structure, all those things point to Gibson buying CL. It's unbelievable that this wasn't understood. Bringing in Roxanne and Fernando to question that at this stage runs the strong risk of blowing up the deal.

Ryan

_____
Kuhn Capital
847/457-2400 (o)
773/330-7547 (c)
www.kuhncap.com

-----Original Message-----
From: Ryan Kuhn [mailto:rkuhn@kuhncap.com]
Sent: Wednesday, December 12, 2007 6:20 PM
To: Henry Juszkiewicz (henry@gibson.com)
Cc: 'Roxanne.Khazarian@gibson.com'
Subject: Notice


Henry,


I hope that you are moving toward the December 17 close of your TC purchase as planned. I
know the process has been challenging, but I think we both agree that a Gibson/TC
combination represents a unique opportunity for Gibson to cement its leadership of the
global music-making and music-enjoyment industry.


As you know, I have invested considerable effort over an extended period of time to put
this deal together, and I am very proud of what has been accomplished. In addition, I have
tolerated chronically late or suspended Gibson retainer payments and T&E reimbursements,
and extended my services well beyond what was required in our initial agreement. For
instance, while I was not contracted to participate in any due diligence investigations
and negotiations leading up to, and for a month after the signing of the LOI, I did so
nonetheless in order to maintain the necessary deal momentum.


Now, as this effort comes to a conclusion, I am personally and professionally very
disappointed by the disparaging comments you have made about me to other participants in
the process, by your cavalier attitude concerning the fees that are owed to my firm, and
by your insistence in these last critical moments to exclude me from facilitating the
closing of the deal. I believe you have damaged my professional reputation and
unnecessarily jeopardized this transaction due to these actions.


Your communications have given me no choice but to consider my legal options in order to
protect my interests in this deal as well in the other acquisition targets that I have
identified on Gibson's behalf. Accordingly, I am in the process of retaining legal counsel
to take action against Gibson and to go public with my charges. I have carefully
considered my position and I believe that you have given me no other alternative.


However, before I authorize legal action I am providing you notice to determine whether
this controversy can be resolved. Therefore, I am giving you until Friday December 14th at
1pm to inform me whether you intend to comply with our contingency agreement and
subsequent deal management agreement by timely paying my fees. If I do not hear from you
by that time I will infer that you do not intend to comply and I will proceed as
necessary. I look forward to hearing from you.

EXHIBIT

D

Regards,

Ryan

Kuhn Capital

847/457-2400 (o)

773/330-7547 (c)

www.kuhncap.com

<u>**CERTIFICATE OF SERVICE**</u>

Ranjit Hakim, an attorney, hereby certifies that he caused a copy of the foregoing **NOTICE OF MOTION, DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY FEDERAL PROCEEDINGS,** and **DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND STAY FEDERAL PROCEEDINGS** to be served upon:

David Bronner
Nicholas Anaclerio
Antonio Caldarone
UNGARETTI & HARRIS LLP
3500 Three First National Plaza
Chicago, IL 60602
(312) 977-4400

by causing the same to be deposited in the United States Mail, postage prepaid on April 18, 2008.

/s/ Ranjit J. Hakim
Ranjit Hakim

9171155